# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| FREE SPEECH COALITION, INC.; DEEP CONNECTION TECHNOLOGIES, INC.; CHARYN PFEUFFER; ELIZABETH HANSON; and JFF PUBLICATIONS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> JAMES M. LE BLANC, in his official capacity as THE SECRETARY OF THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS; JAY DARDENNE, in his official capacity as THE COMMISSIONER OF THE LOUISIANA DIVISION OF ADMINISTRATION; and JEFFREY LANDRY, in his official capacity as THE ATTORNEY GENERAL OF LOUISIANA, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> CASE NO.: ____ <br><br><br> JUDGE: _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, by their undersigned attorneys, allege as follows:

### INTRODUCTION

1. Here we are again. After numerous federal court decisions invalidating as unconstitutional state and federal laws seeking to regulate or ban the publication of material harmful to minors on the internet, the Louisiana legislature has tried yet again. The new laws (collectively, the "Acts" or "Louisiana Acts") place substantial burdens on Plaintiff website operators, content creators, and countless others who use the internet by requiring websites to

age-verify every internet user before providing access to non-obscene material that meets the State's murky definition of "material harmful to minors." Specifically, and in relevant part, both Acts subject to liability any "commercial entity that knowingly and intentionally publishes or distributes material harmful to minors on the internet from a website that contains a substantial portion of such material" where "the entity fails to perform reasonable age verification methods to verify the age of an individual attempting to access the material." Where the earlier-enacted statute creates liability to "an individual for damages resulting from a minor's accessing the material," the latter subjects the offending entity to "civil penalties" imposed pursuant to an enforcement action brought by the Attorney General on behalf of the state. *Compare* La. R.S. § 9:2800.29 (hereinafter, "Private Enforcement Act") *with* La. R.S. § 51:2121 (hereinafter, "Public Enforcement Act").

2.  Pursuant to 18 U.S.C. § 2201 and 2202, and 42 U.S.C. § 1983 and 1988, this action seeks declaratory and injunctive relief to vindicate rights, privileges, and immunities secured by the Constitution and laws of the United States. The Acts violate the First and Fourteenth Amendments to, and the Commerce and Supremacy Clauses of, the United States Constitution, because they impermissibly burden Plaintiffs' exercise of their rights thereunder in myriad ways.

3.  The Acts violate the First Amendment in several respects. First, they impose a content-based restriction on protected speech that requires narrow tailoring and use of the least restrictive means to serve a compelling state interest, yet they capture a substantial quantity of protected speech without accomplishing their stated purpose of protecting minors from materials they may easily obtain from other sources and via other means. Second, compelling providers of online content to place an age-verification content wall over their entire websites

unconstitutionally labels them as "adult businesses," with all the negative implications and ramifications that follow. And third, by requiring the use of some particularized approval method as a condition to providing protected expression, the Acts operate as a presumptively-unconstitutional prior restraint on speech.

4. The Acts violate the Fourteenth Amendment in myriad ways, too. First, because they fail to provide a person of ordinary intelligence with fair notice of to whom the Acts apply, what is required, and what is prohibited, the Acts are impermissibly vague, violating the procedural component of the Due Process Clause. Second, the Acts intrude upon fundamental liberty and privacy rights without being properly tailored to serve the government's interest, thus violating the substantive component of the Due Process Clause. Third, the Acts' exemption of certain news organizations draws impermissible content-based distinctions among persons engaged in free speech, violating the Equal Protection Clause.

5. The Acts also significantly burden interstate commerce by restricting the ability of providers of online content to communicate with Louisiana residents. This burden is clearly excessive in comparison to the limited local benefit provided by the Acts and the availability of less restrictive alternative means of protecting children from erotic content.

6. Finally, by treating website operators as the publishers of material hosted on their websites but produced by other content providers, the Acts stand in direct conflict with 47 U.S.C. § 230 ("Section 230") and are therefore preempted by that supreme federal law.

7. These attempts to restrict access to online content are not novel. The United States Supreme Court invalidated a federal law restricting internet communications deemed harmful to minors on First Amendment grounds in *Reno v. ACLU*, 521 U.S. 844 (1997). The Third Circuit invalidated a second such federal law on First Amendment grounds in *ACLU v.*

*Mukasey*, 534 F.3d 181 (3rd Cir. 2008), *cert. denied*, 555 U.S. 1137 (2009). And in state after state—including Louisiana—laws containing content-based restrictions on internet communications deemed harmful to minors have been held unconstitutional.[1] *See Garden Dist. Book Shop, Inc. v. Stewart*, 184 F. Supp. 3d 331 (M.D. La. 2016).

8.   Despite this long legacy of constitutional invalidity, the Louisiana legislature enacted and the governor signed into law the Private Enforcement Act in June 2022, rendering it effective on January 1, 2023. The Public Enforcement Act was signed into law in June 2023 and will be effective on August 1, 2023. Now, providers (including Plaintiffs) are in the untenable position of abiding by the Acts' terms and enduring the constitutional infringement, or violating them and risking private lawsuits and substantial civil penalties.

9.   As such, Plaintiffs seek to have the Acts declared unconstitutional and void, and to have Defendants enjoined from complying in their enforcement—both preliminarily, pending the hearing and determination of this action, and permanently.

## JURISDICTION AND VENUE

10.  This case arises under the United States Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3). It seeks remedies under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §§ 1983 and 1988, and Fed. R. Civ. P. 65.

---

[1]*See, e.g., American Booksellers Foundation v. Sullivan*, 799 F. Supp. 2d 1078 (D. Alaska 2011) (Alaska); *American Booksellers Foundation v. Coakley*, 2010 WL 4273802 (D. Mass. 2010) (Mass.); *PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004) (Virginia); *American Booksellers Foundation v. Dean*, 342 F.3d 96 (2d Cir. 2003) (Vermont); *Cyberspace Communications, Inc. v. Engler*, 238 F.3d 420 (6th Cir. 2000) (Michigan); *ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999) (New Mexico); *ACLU v. Goddard*, Civ. 00- 0505 (D. Ariz. Aug. 11, 2004) (Arizona); *Southeast Booksellers v. Ass'n v. McMaster*, 282 F. Supp. 2d 389 (D.S.C. 2003) (South Carolina); *American Library Association v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997) (New York).

11. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this district.

**PARTIES**

12. Plaintiff Free Speech Coalition, Inc. (FSC) is a not-for-profit trade association incorporated under the laws of California with its principal place of business in Canoga Park, CA. FSC assists film makers, producers, distributors, wholesalers, retailers, internet providers, performers, and other creative artists located throughout North America in the exercise of their First Amendment rights and in the vigorous defense of those rights against censorship. Founded in 1991, the Free Speech Coalition currently represents hundreds of businesses and individuals involved in the production, distribution, sale, and presentation of constitutionally-protected and non-obscene materials that are disseminated to consenting adults via the internet. Most of that material would fit within Louisiana's statutory definition of "material harmful to minors." The Free Speech Coalition sues on its own behalf and on behalf of its members to vindicate its own constitutional rights, its members' constitutional rights, and those of the members' respective owners, officers, employees, and current and prospective readers, viewers, and customers.

13. Plaintiff Deep Connection Technologies Inc. (DCT) is a business corporation organized under the laws of Delaware with its principal place of business in San Francisco, CA. DCT operates O.school, a judgment-free online educational platform focused on sexual wellness. Andrea Barrica, O.school's founder and CEO, is a queer woman of color who has grown O.school to reach more than 25 million people globally and 4.2 million across the United States. O-school's mission is to help people worldwide improve their sexual health, power, and confidence. Previously, Barrica co-founded inDinero.com, the leading financial solution

for growing startups, and served as a partner at 500 Startups, a global venture capital fund where she worked with hundreds of startup companies. Barrica was raised in a religious, conservative Filipino family that preached abstinence, and she received only fear-based sex education in public schools. Seeking support and information about sex and sexuality, Barrica was unable to find reliable resources online, leading her to launch O.school in 2017 in order to change the way people learn about sexuality. She is the author of *Sextech Revolution: The Future of Sexual Wellness*, and she is a professional speaker, having presented for TED Unplugged, SXSW, the Women in Tech Festival, UN Women, Planned Parenthood, and others. Barrica fears that O.school contains a "substantial portion" of content that meets the statutory definition of "material harmful to minors." As she believes that O.school provides critical sex education that is appropriate (and necessary) for older minors, she opposes any age-verification measure that would preclude those teens from accessing O.school's content.

14. Plaintiff Charyn Pfeuffer (Pfeuffer) is a 50-year-old woman living in Seattle, WA. She has written professionally about sex and relationships for 25 years and has been creating online sexual content for three. Pfeuffer's writings have been published by sites that do not contain a "substantial portion" of "material harmful to minors" (like Refinery29, Thrillist, Fodor's The Daily Dot, Men's Health), as well as some sites that very well might (like Kinkly). She archives her written work in an online portfolio and shares it via her social media platforms. More recently, through her online video sex work, she has discovered an endless array of fans seeking someone to speak with, including committed partners interested in exploring a particular fantasy before bringing it into their real world relationships; seniors looking for light flirtation; recently single men and women looking for consolation; psychologically

isolated people (especially active-duty and former military personnel) who have been failed by traditional support systems; and those pursuing basic sexual education, including what lubricants to buy (and when to use them), how to perform oral sex, and how to talk about consent and establish boundaries. On webcam sites OnlyFans and SextPanther, much of Pfeuffer's content meets the statutory definition of "material harmful to minors."

15. Plaintiff Elizabeth Hanson is 40-year-old woman living in Slidell, Louisiana. She served as an active-duty member of the United States Coast Guard from 2008 to 2018, during which time she coordinated search and rescue operations, law enforcement activities, drug and migrant interdiction, and other missions across the United States. She is also a dedicated military spouse, with her husband serving as an active-duty Coast Guardsman. During the prolonged periods of separation from her husband when he is deployed, Hanson relies on pornography to alleviate the mental strain and tension resulting from his absence and to keep the romantic light aflame between them by watching the same sexy video together from afar. Although Hanson has followed her husband to Louisiana after his recent relocation orders, the federal Military Spouse Residency Relief Act protects her right to maintain her legal residence in Texas, where she and her husband lived before their recent change-of-station move. Without a Louisiana driver's license, Hanson is unable to access adult websites that rely on LA Wallet to age-verify their users, and—particularly after the recent data breach of Louisiana's Office of Motor Vehicles[2]—too concerned about hackers obtaining her search and watch histories from verification vendors to entrust them with her identity information.

16. Plaintiff JFF Publications, LLC (JFF) is a limited liability company organized under the laws of Delaware with its principal place of business in Broward County, FL. It has one Member,

---

[2] *See* https://gov.louisiana.gov/index.cfm/newsroom/detail/4158.

a natural person who is a citizen of Florida. JFF operates an internet-based platform at the domain <JustFor.Fans> that allows independent producers/performers of erotic audiovisual works to publish their content and provide access to fans on a subscription basis. Each producer/performer operates and maintains an individual JustFor.Fans channel, which may contain photographs or videos and permits the exchange of messages between producers/performers and fans. JFF developed and continues to enhance the software and features that drive the JFF platform, it arranges third-party billing capabilities, and it otherwise maintains the platform. Although it develops and implements advertising and marketing plans for the platform, many of the independent producers/performers selling subscriptions on the platform implement their own marketing plans to drive customers to their specific JFF channel. Most often, producers/performers maintain a social media presence through which they encourage their fans to purchase a subscription to their JustFor.Fans channel, sometimes providing a direct link to the JFF platform. JFF is confused about what constitutes "reasonable age verification methods" required by the Acts and concerned about the costs of compliance.

17. Defendant James M. Le Blanc is a person within the meaning of Section 1983 of Title 42 of the United States Code, and he currently serves as the Secretary of the Louisiana Department of Public Safety and Corrections. In his capacity as Secretary, he "is responsible for the functioning and control of all programs within the Department"; he "formulates rules and regulations and determines policy regarding management, personnel, and total operations"; and he "leads and supports central office and field unit staff, which are charged with carrying out the work of the agency."[3] As such, he has some connection with the enforcement of both

---

[3] *See* https://doc.louisiana.gov/about-the-dpsc/.

Acts. Both Acts require "reasonable age verification methods," which are expressly satisfied where "the person seeking to access the material" is required to provide "a digitized identification card as defined in R.S. § 51:3211." La. R.S. § 9:2800.29(D)(8) and La. R.S. § 51:2121(D)(8). The cross-referenced statute defines "digitized identification card" as "a data file available on any mobile device which has connectivity to the internet through a state-approved application that allows the mobile device to download the data file from the Department of Public Safety and Corrections or an authorized representative of the Department of Public Safety and Corrections that contains all of the data elements visible on the face and back of a license or identification card and displays the current status of the license or identification card." La. R.S. § 51:3211. He is thus necessarily complicit in the enforcement of both Acts. He is sued for prospective relief concerning his future exercise of the foregoing powers and duties in order to prevent his subjecting the Plaintiffs and others to a deprivation of rights, privileges, or immunities secured to them by the Constitution and laws of the United States.

18. Defendant Jay Dardenne is a person within the meaning of Section 1983 of Title 42 of the United States Code, and he currently serves as the Commissioner of the Louisiana Division of Administration. In his capacity as Commissioner, he oversees a division performing "a wide variety of activities, including . . . assist[ing] vendors in doing business with the state and giv[ing] agencies guidance in the state purchasing and contracting process as they seek goods and services."[4] The Division of Administration is responsible for the development, implementation, and administration of LA Wallet—a digital identification service that works

---

[4] *See* https://www.doa.la.gov/doa/comm/.

with private age-verification vendors.[5] As such, he has some connection with the

enforcement of both Acts. He is sued for prospective relief concerning his future exercise of

the foregoing powers and duties in order to prevent his subjecting the Plaintiffs and others to

a deprivation of rights, privileges, or immunities secured to them by the Constitution and

laws of the United States.

19. Defendant Jeff Landry is a person within the meaning of Section 1983 of Title 42 of the

United States Code, and he currently serves as the Attorney General of the State of

Louisiana. The Public Enforcement Act expressly empowers the Attorney General to

"conduct an investigation of the alleged violation and initiate a civil action in the Nineteenth

Judicial District Court for the parish of East Baton Rouge on behalf of the state to assess civil

penalties" from commercial publishers and distributors of "material harmful to minors" who

fail to perform reasonable age verification methods. *See* La. R.S. § 51:2121. He is thus solely

and directly responsible for the enforcement of the Public Enforcement Act. Moreover, as the

legal officer for the State of Louisiana, when "necessary for the assertion or protection of any

right or interest of the state . . . [he] shall have authority . . . to supersede any attorney

representing the state in any civil or criminal action." Louisiana Const. Art IV, § 8. He is

sued for prospective relief concerning his future exercise of the foregoing powers and duties

in order to prevent his subjecting the Plaintiffs and others to a deprivation of rights,

privileges, or immunities secured to them by the Constitution and laws of the United States.

## FACTS

### I. Communication Over the Internet

---

[5] *See* https://apps.apple.com/us/app/la-wallet/id1386930269 (listing the Louisiana Division of Administration as the developer of LA Wallet in the Apple app store);
https://play.google.com/store/apps/details?id=gov.la.omv.lawallet&hl=en_US&gl=US (same for Google app store).

20. The internet is a decentralized, global medium of communication that links people, institutions, corporations, and governments around the world. It is a giant computer network that interconnects innumerable smaller groups of linked computer networks and individual computers. The internet connects an estimated 5.39 billion people—or 68% of the world's population, and in Louisiana, it is estimated that 82.9% of residents are internet users.[6]

21. Because the internet merely links together numerous individual computers and computer networks, no single entity or group of entities controls the material made available on the internet or limits the ability of others to access such materials. Rather, the range of digital information available to internet users is individually created, maintained, controlled, and located on millions of separate individual computers around the world.

22. The internet presents extremely low entry barriers to anyone who wishes to provide or distribute information or gain access to it. Unlike television, cable, radio, newspapers, magazines or books, the internet provides the average citizen and business, whether large or small, with an affordable means for communicating with, accessing, and posting content to a worldwide audience "with a voice that resonates farther than it could from any soapbox." *Reno*, 521 U.S. at 870. Although the majority of the information on the internet does not depict or describe nudity or sexual activity, such material is indeed widely available on the internet.

23. An Internet Protocol (IP) address is a unique address that identifies a connection to a device on the internet or a local network, much like a telephone number is used to connect a telephone to other telephones. In essence, an IP address is the identifier that allows

---

[6] *See* http://www.internetworldstats.com/stats.htm;
https://www.statista.com/statistics/184691/internet-usage-in-the-us-by-state/.

information to be sent between devices on a network. Internet Service Providers (ISPs) and

telecommunications companies control blocks of IP addresses, and the location of an internet

connection can be roughly determined according to the geo-location those companies

assigned the IP address associated with a connection.

24. A Virtual Private Network (VPN) functions as an intermediary between an individual

computer and the targeted server. It hides the user's actual public IP address and instead

"tunnels" traffic between the user's device and a remote server. Setting up a VPN is free and

simple, and doing so permits users to hide their location while browsing the web.

**II.      The Private Enforcement Act (La. R.S. § 9:2800.29)**

25. In June 2022, the Louisiana legislature enacted, and Governor John Bel Edwards signed into

law, Act No. 440, codified at La. R.S. § 9:2800.29 and in effect as of January 1, 2023. The

operative provisions of the Act are as follows:

B.(1) Any commercial entity that knowingly and intentionally publishes or distributes
material harmful to minors on the internet from a website that contains a substantial
portion of such material shall be held liable if the entity fails to perform reasonable age
verification methods to verify the age of individuals attempting to access the material.

(2) Any commercial entity or third party that performs the required age verification
shall not retain any identifying information of the individual after access has been
granted to the material.

(3)(a) Any commercial entity that is found to have violated this Section shall be liable
to an individual for damages resulting from a minor's accessing the material, including
court costs and reasonable attorney fees as ordered by the court.

(b) A commercial entity that is found to have knowingly retained identifying
information of the individual after access has been granted to the individual shall be
liable to the individual for damages resulting from retaining the identifying information,
including court costs and reasonable attorney fees as ordered by the court.

C.(1) This Section shall not apply to any bona fide news or public interest broadcast,
website video, report, or event and shall not be construed to affect the rights of any
news-gathering organizations.

(2) No internet service provider, or its affiliates or subsidiaries, search engine, or cloud service provider shall be held to have violated the provisions of this Section solely for providing access or connection to or from a website or other information or content on the internet or a facility, system, or network not under that provider's control including transmission, downloading, intermediate storage, access software, or other to the extent such provider is not responsible for the creation of the content of the communication that constitutes material harmful to minors.

D. For purposes of this Section:

(1) "Commercial entity" includes corporations, limited liability companies, partnerships, limited partnerships, sole proprietorships, or other legally recognized entities.

(2) "Distribute" means to issue, sell, give, provide, deliver, transfer, transmute, circulate, or disseminate by any means.

(3) "Internet" means the international computer network of both federal and nonfederal interoperable packet switched data networks.

(4) "Material harmful to minors" is defined as all of the following:

(a) Any material that the average person, applying contemporary community standards would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest.

(b) Any of the following material that exploits, is devoted to, or principally consists of descriptions of actual, simulated, or animated display or depiction of any of the following, in a manner patently offensive with respect to minors:

(i) Pubic hair, anus, vulva, genitals, or nipple of the female breast.

(ii) Touching, caressing, or fondling of nipples, breasts, buttocks, anuses, or genitals.

(iii) Sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, excretory functions, exhibitions, or any other sexual act.

(c) The material taken as a whole lacks serious literary, artistic, political, or scientific value for minors.

(5) "Minor" means any person under the age of eighteen years.

(6) "News-gathering organization" means any of the following:

(a) An employee of a newspaper, news publication, or news source, printed or on an online or mobile platform, of current news and public interest, while operating as an

employee as provided in this Subparagraph, who can provide documentation of such employment with the newspaper, news publication, or news source.

(b) An employee of a radio broadcast station, television broadcast station, cable television operator, or wire service while operating as an employee as provided in this Subparagraph, who can provide documentation of such employment.

(7) "Publish" means to communicate or make information available to another person or entity on a publicly available internet website.

(8) "Reasonable age verification methods" include verifying that the person seeking to access the material is eighteen years of age or older by using any of the following methods:

(a) Provide a digitized identification card as defined in R.S. 51:3211.

(b) Require the person attempting to access the material to comply with a commercial age verification system that verifies in one or more of the following ways:

(i) Government-issued identification.

(ii) Any commercially reasonable method that relies on public or private transactional data to verify the age of the person attempting to access the information is at least eighteen years of age or older.

(9) "Substantial portion" means more than thirty-three and one-third percent of total material on a website, which meets the definition of "material harmful to minors" as defined by this Section.

(10) "Transactional data" means a sequence of information that documents an exchange, agreement, or transfer between an individual, commercial entity, or third party used for the purpose of satisfying a request or event. Transactional data can include but is not limited to records from mortgage, education, and employment entities.

26. The Private Enforcement Act became effective on January 1, 2023.

### III.    The Public Enforcement Act

27. In June 2023, the Louisiana legislature enacted, and Governor John Bel Edwards signed into

law, Act No. 216, codified at La. R.S. § 51:2121 and in effect as of on August 1, 2023. The

operative provisions of the Public Enforcement Act are as follows:

A(1) Any commercial entity that knowingly and intentionally publishes or distributes material harmful to minors on the internet from a website that contains a substantial portion of such material shall be subject to civil penalties as provided in this Section if the entity fails to perform reasonable age verification methods to verify the age of individuals attempting to access the material.

(2) The attorney general may conduct an investigation of the alleged violation and initiate a civil action in the Nineteenth Judicial District Court for the parish of East Baton Rouge on behalf of the state to assess civil penalties. Prior to asserting a cause of action, the attorney general shall provide the commercial entity with a period of time of not less than thirty days to comply with this Section.

B.(1) Any commercial entity that violates this Section may be liable for a civil penalty, to be assessed by the court, of not more than five thousand dollars for each day of violation to be paid to the Department of Justice, in order to fund the investigation of cyber crimes involving the exploitation of children.  In addition to the remedies provided in this Section, the attorney general may request and the court may impose an additional civil penalty not to exceed ten thousand dollars for each violation of this Section against any commercial entity found by the court to have knowingly failed to perform reasonable age verification methods to verify the age of individuals attempting to access the material. The civil penalty shall be paid to the Department of Justice in order to fund the investigation of cyber crimes involving the exploitation of children.

(2) Each violation may be treated as a separate violation or may be combined into one violation at the option of the attorney general.

(3) Any commercial entity that violates this Section may be liable to the attorney general for all costs, expenses, and fees related to investigations and proceedings associated with the violation, including attorney fees.

(4) If the court assesses a civil penalty pursuant to this Section, the Department of Justice shall be entitled to legal interest as provided in R.S. 9:3500 from the date of imposition of the penalty until paid in full.

C.(1) This Section shall not apply to any bona fide news or public interest broadcast, website, video, report, or event and shall not be construed to affect the rights of any news-gathering organization.

(2) No internet service provider, or its affiliates or subsidiaries, search engine, or cloud service provider shall be held to have violated the provisions of this Section solely for providing access or connection to or from a website or other information or content on the internet or a facility, system, or network not under the control of that provider, including transmission, downloading, intermediate storage, access software, or other related capabilities, to the extent such provider is not responsible for the creation of the content of the communication that constitutes material harmful to minors.

28. Subsection D also defines the same terms the same way as does the Private Enforcement Act.[7]

**IV.     The Impact of the Acts**

29. To comply with the Acts, commercial websites providing content that they are concerned might meet the vague statutory definition of "material harmful to minors" may respond in one of three ways: by (1) attempting to divert all web traffic from Louisiana IP addresses, thus precluding *all* online visitors from this State; (2) contracting (at great expense) the services of age-verification operations to age-verify visitors to their site; or (3) declining to abide by the terms of the Acts, thus risking private lawsuits and civil enforcement actions. It is a Hobson's Choice they should not have to make.

**A.  The Ineffectiveness of the Acts and the Effectiveness of Alternative Means**

30. While placing overwhelming burdens on certain providers of content online, the Acts will fail to accomplish their goal of protecting Louisiana's minors. Because the Acts require age-verification in order to access only those websites that offer "material harmful to minors" as a "substantial portion" of their total content (defined as one-third or more), minors will face no impediment to obtaining such material from websites watered down—either incidentally or purposefully in order to avoid the consequences of the Acts—with *other* content unoffensive to the sensibilities of the Louisiana legislature. Whether "content" percentages

---

[7] The few exceptions are that the Public Enforcement Act does not define "transactional data" and contains minor and immaterial modifications to the definition of "news-gathering organization." *Compare* Public Enforcement Act Section D(6)(b) (defining news-gathering organization to include a "radio broadcast station, television broadcast station, cable television operator, wire service, or an employee thereof") *with* Private Enforcement Act Section D(6)(b) (defining it as "[a]n employee of a radio broadcast station, television broadcast station, cable television operator, or wire service while operating as an employee as provided in this Subparagraph, who can provide documentation of such employment").

are measured in bytes of material, discrete web pages, seconds of video, words of a sexual nature, or some other metric, and whether they include linked material, is entirely unclear. What *is* clear is that—given enough non-"harmful" material on a single site—even the providers of material that *is* "harmful to minors" under any definition earn a pass under the Acts.

31. Minors also have other routes to obtaining "material harmful to minors" over the internet, including by: (1) pursuing such material published by persons and entities in other countries beyond the jurisdiction of Louisiana's state or federal courts; (2) using a VPN to create an encrypted connection between the device and a remote server operated by the VPN service in another state or country[8]; and (3) resorting to the dark web to obtain material far more harmful than what is available from popular adult websites.

32. At the same time, there are alternative means available for Louisiana parents to address the goal of the Acts. The two major personal computer operating systems, Microsoft and Apple, include parental control features straight out of the box. Almost all browsers, including Google Chrome, Mozilla Firefox, Microsoft Edge, and Apple's Safari, also have parental control options. If parents want to add additional parental control features, they may easily purchase supplementary software like Bark or NetNanny or even download additional software for free, including Questodio, Kaspersky Safe Kids, FamilyKeeper, and others. These features enable parents to block access to sexually explicit materials on the Web, prevent minors from giving personal information to strangers by e-mail or in chat rooms, limit a child's screentime, and maintain a log of all online activity on a home computer. Parents can also use screening software that blocks messages containing certain words, as

---

[8] *See* https://www.pcmag.com/how-to/what-is-a-vpn-and-why-you-need-one.

well as tracking and monitoring software. A parent also may restrict and observe a child's use of the internet merely by placing a computer in a public space within the home. All of these methods constitute "less restrictive means" for accomplishing the same ends.

33. Over twenty years ago, the United States Supreme Court recognized that even the parental filtering programs available at the time were less restrictive and certainly more effective than government-imposed age-verification methods. *See Ashcroft v. ACLU*, 542 U.S. 656, 666 (2002). In that case, although a credit card was required for age-verification, the Court noted that it was *still* a less effective option due to the high rate of false certification.

34. Fourteen years later, a Louisiana federal court similarly enjoined enforcement of a prior attempt at age-verification legislation, recognizing that:

> The need for parental cooperation does not automatically disqualify a proposed less restrictive alternative, and the Court should not presume parents, given full information, will fail to act[.] And while the State has a compelling interest in protecting children, the Court also recognizes the autonomy parents possess over the rearing of their children . . . . Despite the flaws inherent in content-filtering, the State's burden is not merely to show that a proposed less restrictive alternative has some flaws; its burden is to show that it is less effective, which the State has failed to do.

*Garden Dist. Book Shop*, 184 F. Supp. 3d at 338–39.

### B.  The Impact on Older Minors

35. The impact of the Acts and their constitutionality depends, to a significant extent, on the meaning of "material harmful to minors" under Louisiana law. In *Ginsberg v. New York*, 390 U.S. 629 (1968), the United States Supreme Court established an obscenity test for minors, variable as to each of its three components—whether the material appeals to the prurient, shameful, or morbid interest of minors in sex; whether the material is offensive to the average adult applying contemporary community standards with respect to what is suitable

for minors; and whether material taken as a whole lacks serious literary, artistic, political, or scientific value for minors.

36. With respect to at least the second and third components of this test—what is suitable for minors under contemporary community standards, and whether the material has serious value for minors—the variability relates to the age and maturity of the minor. There is a broad range of material that has serious literary, artistic, political, or scientific value for at least some 16- and 17-year-olds which might legitimately be considered "harmful" to a 10-year-old. For example, materials about sexual relations, the risk of sexually-transmitted diseases, sexual health, and the enjoyment of sex certainly have serious value to many 16- and 17-year-olds in Louisiana (where 16-year-old minors may marry with parental consent).

37. Because the Acts apparently include material appropriate for older minors within the scope of "material harmful to minors" that requires age verification, they are unconstitutional for the reasons set forth throughout this Complaint. Whether material is designed to appeal to the prurient interest is determined by an average person applying contemporary community standards *with respect to minors*. Whether material is presented in a "patently offensive" manner is, again, considered *with respect to minors*. And whether the material lacks serious literary, artistic, political, or scientific value is, again, considered *with respect to minors*.

38. The Acts fail to explicitly exclude material appropriate for older minors from the "material harmful to minors" for which access is conditioned upon proof of majority. Requiring persons who publish such material on the internet to place it behind an age-verification wall violates the First and Fourteenth Amendments by infringing the constitutional rights of both older minors (who are denied access to constitutionally-protected material), and the commercial entities that publish or distribute such material.

**C.  The Impact on All Minors**

39. Requiring age verification to access a website whose content offerings include a "substantial

portion" of "material harmful to minors" means denying those minors access to websites

whose content offerings are overwhelmingly *not* classified as "material harmful to minors."

*See* La. R.S. § 9:2800.29(D)(9) and La. R.S. § 51:2121(D)(9) (each defining "substantial

portion" to mean "more than thirty-three and one-third percent of total material on a

website"). Both Acts aim to preclude *all* minors from accessing even those websites offering

content, two-thirds of which is plainly *not* violative of the already vague and overbroad

standard defining "material harmful to minors." Conceivably, websites like Twitter could

soon find themselves falling with the ambit of these statutes.[9]

**D.  The Impact on Adults**

40. The Acts demand that, as a condition of access to constitutionally protected content, an adult

must provide a digital proof of identity to adult content websites that are doubtlessly capable

of tracking specific searches and views of some of the most sensitive, personal, and private

contents a human being might search for. Although the Private Enforcement Act provides a

cause of action to any website visitor whose identifying information is retained by the

website, such provision offers cold comfort to adults who value the privacy of their search

history for non-obscene pornographic material more than a speculative damages award in an

era of rampant data leaks—including from Louisiana government databases[10] and websites

purporting to place a premium on privacy and discretion.[11] The inevitable result is that at

---

[9] *See* https://www.reuters.com/technology/exclusive-where-did-tweeters-go-twitter-is-losing-its-
most-active-users-internal-2022-10-25/ (noting the growth of adult content on Twitter).
[10] *See* https://gov.louisiana.gov/index.cfm/newsroom/detail/4158.
[11] *See, e.g.,* https://www.wired.com/2015/08/happened-hackers-posted-stolen-ashley-madison-
data/ (discussing Ashley Madison data breach).

least some portion of Louisiana adults will feel the chill of the Acts and forego accessing this constitutionally-protected material.

### E. The Impact on Non-Pornographic Websites

41. Because of the Acts' vagueness, cautious operators of even *non*-pornographic websites must place an age-verification content wall over their entire websites if they wish to continue communicating with Louisiana audiences without risking ruinous tort liability. Doing so labels them an "adult business"—resulting not only in declining internet traffic, but social stigma, lost ad revenue, and exclusion from public or private programs or curricula. If they are a website that processes payments, they may lose the ability to accept VISA, Mastercard, Amex, and other major credit cards and be forced to use third-party billing companies that charge fees up to 15% of the purchase price, rather than the 3-5% typically charged by credit card companies. They also may face difficulty purchasing business liability insurance and hiring employees. Some of the Supreme Court's leading First Amendment precedents have established the principle that the government may not compel persons to speak a particular message. *See Wooley* v. *Maynard,* 430 U.S. 705 (1977) (requiring motorists to display state's "live free or die" motto on license plate found to violate First Amendment); *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc*., 515 U.S. 557 (1995) (finding First Amendment violation where parade organizers were forced to accept groups espousing contrary messages). That principle is simply incompatible with the requirement of commercial entities that find themselves on the margins of the Acts' reach.

### F. Vagueness and Overbreadth

42. Because many of the terms in the Acts are vague and overbroad, they further restrict and chill the speech of providers of content online and restrict the availability of certain material to

those entitled and wishing to receive it. The Acts are riddled with vague words, phrases, and requirements, including the following.

43. The phrase "taken as a whole" in the definition of "material harmful to minors" is vague because what constitutes the "whole" is unclear in the context of the internet generally, or a particular website more specifically. Should one consider only a specific article, certain text, or an individual image on a website? Or should one consider the web page on which that text or image appears? Or the entire website? And should one include linked material?

44. The phrase "substantial portion," defined as "more than thirty-three and one-third percent of total material on a website," is vague insofar as it fails to explain how "total material" is calculated. Is it by the volume of data? The number of posts? What is the proper metric to measure? Gigabytes? Character count? Number of images? Video runtime? And what about linked material? May a website avoid the problem altogether by providing a link to all the anodyne content in the local public library?

45. The term "minor," defined as "any person under 18 years old," is vague insofar as it fails to designate the whole from which a content provider must ascertain the average. Pursuant to the Acts, whether material is designed to appeal to the prurient interest, is presented in a "patently offensive manner," or lacks serious literary, artistic, political, or scientific value is determined with respect to minors generally. Does this "minor" refer to an average 17-year-old days from an 18th birthday? Or to some hypothetical pre-teen reflecting the median sensibility across *all* minors, from infants to high school seniors? Or to some other person or position?

46. The terms "commercial entity" and "website" lack the requisite precision demanded by the First Amendment. Because a "commercial entity" includes every "legally recognized

entit[y]" from the largest corporation down to the smallest "sole proprietorship," the Acts (intentionally or otherwise) require individual performers to implement their own age-verification protocols even when relying on another company's platform to host their content. At best, this is an inefficient and cost-prohibitive way of effecting the State's interest. At worst, it is impossible where performers do not control the code upon which the platforms are built. Compounding the problem is the lack of definitude as to what constitutes a "website" in the first place. In its simplest form, a website *can* mean a series of connected pages under a single domain name. Often, however, webpages have more complicated structures, sometimes involving multiple domain names or subdomains, links to separate but related businesses, or links to third-party content living on different servers. In failing to define "website," the Acts likely capture far more speech than intended, and certainly more than is constitutional.

47. The statutory catch-all permitting "any commercially reasonable method that relies on public or private transactional data" as a means of verifying a user's age provides no guideposts whatsoever, as "commercially reasonable" is a vague term not defined by the Acts.

48. Reference to "contemporary community standards" is vague and overbroad, due to the borderless nature of the internet. Louisiana is a diverse state, and the "contemporary community standards" vary widely from the French Quarter of New Orleans to the suburbs of Monroe. But when a content provider publishes material on a website, the same material is made available in *every* Louisiana parish. To avoid running afoul of the Acts, website operators must abide by a "most prudish parish" standard—restricting (in the case of minors) or chilling (in the case of adults) substantial quantities of constitutionally protected content.

49. It is unclear what, exactly, a commercial entity must "know" or "intend" to be liable under the Acts. Must the entity merely intend to publish or distribute material that, incidentally, happens to fit the statutory definition of "material harmful to minors?" Must the entity *know* that the published material meets that definition? Must it know that the publishing website's offerings, as a whole, contain at least one-third such material? The question is of particular salience to commercial entities that publish or distribute materials on websites owned and operated by *other* commercial entities—potentially tasking the former with a duty to inventory the full array of materials offered by the latter.

**G.  The Prior Restraint**

50. The Acts effectively require that, before a covered commercial website may disseminate any constitutionally protected expression to a consenting adult requesting it, the website must affirmatively employ a "reasonable age verification method" on pain of express statutory liability. The requirement thus imposes a classic prior restraint on speech.

51. Prior restraints are not unconstitutional per se, but they come to the courts bearing "a heavy presumption against [their] constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). Prior restraints arising from a government pre-approval requirement are presumptively unconstitutional because they pose the danger that any discretion exercised in connection with the approval process may become an instrument of content-based censorship that will impose a serious chill upon the willingness of affected speakers to speak. Government may not require this sort of pre-approval process unless the discretion involved in administering it—both substantive and procedural—is tightly constrained to avoid the inherent censorship dangers.

52. With respect to those procedural safeguards, the pre-approval process must be administered so that the presumption favors allowing the expression in question; the burden must always fall on the side of disallowing the expression. Secondly, the pre-approval process must operate rapidly and without unnecessary delay. Finally, the costs of the pre-approval process, if assessed to the putative speaker at all, must also be tightly and objectively constrained so as to avoid unnecessarily burdening the expression in question.

53. At two points in their operation, the Acts impose unconstitutional prior restraints on the communication between covered websites and adults seeking to access them. First, covered websites must employ "reasonable age verification methods" when individuals attempt to access their expression. But even assuming that these statutory specifications suffice, nothing requires that any such methods be made available to all website operators, operate reliably with common computer software, or even exist in the first place. The State of Louisiana may not statutorily impose a prior restraint only to leave its operation entirely to others who may or may not take up the mantle—*particularly* when leaving key terms like "commercially reasonable" undefined. Moreover, nothing constrains how quickly such systems must operate or what fees they may charge for their services.

54. The same unconstrained discretion applies to the digitized identification card age verification option. Although one such card presently exists for a limited number of operating systems, the State of Louisiana does not provide it directly but only through a commercial entity that may or may not continue to exist, may or may not choose to do business with covered websites, and may or may not charge constitutionally permissible fees for use of its product.

55. Thus, nothing in the Acts require the State or its contractors to operate a properly constrained prior restraint on speech, and nothing prevents content-based discrimination that would leave covered websites without any "reasonable age verification methods" at all.

**H.  The Exception for "News-Gathering" Organizations**

56. The Acts purport to exempt any "bona fide news or public interest broadcast, website video, report, or event and shall not be construed to affect the rights of a news-gathering organization," defined to include employees of a newspaper, news publication, news source of current news and public interest, radio broadcast station, television broadcast station, cable television operator, or wire service. Through this definition, the Acts make impermissible distinctions among media providers—exempting any employee of chosen media while offering no such protection to independent (non-employee) "news gatherers," or to bloggers, vloggers (video bloggers), or podcasters whose platforms do not fit within the definition of "news-gathering organization."

57. This vague exemption seeks to preserve the free speech rights of some while trampling on the free speech rights of others who publish the same content. While independent news gatherers receive no exemption, news websites like Str8upgayporn.com, xbiz.com, and avn.com—which focus on the adult entertainment industry and contain a significant amount of material otherwise regulated by the Acts—likely are not subject to the age-verification procedures. By making this distinction among media, the Acts violate the Free Speech and Free Press Clauses of the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment.

**I.  The Invasion of Privacy Interests**

58. The Acts violate the right to substantive due process as guaranteed by the Fourteenth Amendment to the United States Constitution, as they impinge upon liberty and privacy interests in one's own private sexual conduct. *See Lawrence v. Texas*, 539 U.S. 558 (2003).

59. Offline age-verification does not produce a ledger of age-verified adults; one may enter an adult bookstore or sex shop merely by presenting a license proving his or her age of majority, and the clerk need not do anything beyond checking the date of birth and returning the ID. But age-verification over the internet, in the manner contemplated by the Acts, invites the risk, real or reasonably perceived, that the viewer's digital "fingerprint" will be left on the site—and not just on the website's "front door," but on every bit of digital content examined. It's a striking invasion of privacy at a time and place when a person legitimately expects it most. No governmental interest exists sufficient to justify this intrusion.

**J.   The Burden on Interstate and Foreign Commerce**

60. The Acts burden interstate commerce by impinging on communication, protected by the First Amendment, between out-of-state content-providers and Louisianans in several ways.

61. The Acts effectively require a website operator to choose between (on one hand) diverting web traffic from Louisiana or (on the other) making the laborious determination of whether more than one-third of its content fits the vague and overbroad definition of "material harmful to minors" and then instituting the State's required age-verification protocols. And because satellites and cellular towers do not appreciate state boundaries, residents of border towns in neighboring states of Arkansas, Mississippi, and Texas might find themselves restricted from accessing certain websites or required to provide a Louisiana digital driver's license that they do not have.

62. Moreover, Louisiana might be among the first state to market with these age-verification requirements, but it surely won't be the last, as others have already passed similar legislation. *See, e.g.,* Utah S.B. 287 (effective May 3, 2023); Mississippi S.B. 2346 (effective July 1, 2023); Virginia S.B. 1515 (effective July 1, 2023); Arkansas S.B. 66 (effective July 31, 2023); Texas H.B. 1181 (effective September 1, 2023); Montana S.B. 544 (effective January 1, 2024). With each state or locality defining "material harmful to minors" differently, requiring consideration of different community standards, and demanding different age-verification technologies and protocols, website operator compliance becomes exorbitantly laborious, confusing, and expensive. The result might be a total shutdown of adult websites or stringent, across-the-board age-verification protocols affecting users from states that have *not* imposed similar restrictions on web content. The unimpeded interstate exchange of constitutionally-protected material clearly outweighs any one state's—including Louisiana's—interests in requiring age verification to protect minors from viewing certain adult content online.

**K.  The Express Conflict with Federal Statutory Law**

63. Under Section 230, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C § 230(c)(1).

64. Plaintiff JFF is a "provider or user of an interactive computer service" within the intendment of the statute. *See* 47 U.S.C § 230(f)(2) (defining "interactive computer service" to mean "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by

libraries or educational institutions."). JFF does not produce content that could plausibly be deemed "material harmful to minors." Rather, it merely provides the platform for other "information content providers." *See* 47 U.S.C § 230(f)(3) (defining term to mean "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service").

65. In seeking to render JFF and other providers and users of "interactive computer services" liable on account of the actions of "content providers," the Acts stand in direct conflict with Section 230, which expressly preempts inconsistent state laws. *See* 47 U.S.C § 230(e)(3). Article VI, Paragraph 2 of the U.S. Constitution requires that federal law take precedence in such case.

## L.  The Need for Injunctive Relief

66. The Acts have placed Plaintiffs in justified fear that, if they continue to exercise their constitutional rights, they will be haled into court either by the attorney general or any host of individuals alleging harm. Plaintiffs have no adequate remedy at law.

67. Because the Public Enforcement Act empowers the attorney general to bring enforcement actions against perceived violators of an unconstitutional statute, protecting the constitutional rights at issue demands an injunction precluding that enforcement.

68. Because the Private Enforcement Act creates a *private* right of action by which Louisiana residents are empowered to do the State's bidding, protecting the constitutional rights at issue demands an injunction requiring the Secretary of Louisiana's Department of Public Safety and Corrections and the Commissioner of the Louisiana Division of Administration to provide—affordably, reliably, and with sufficient privacy protections—the age-verification procedures called for by the Acts in lieu of reliance solely upon private age-verification

vendors serving as gatekeepers between users and providers of constitutionally protected content.

## CAUSES OF ACTION

### COUNT I (All Plaintiffs)

### Violation of Free Speech Rights Under the First and Fourteenth
### Amendments of the United States Constitution

69. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

70. The Acts violate the First Amendment (made applicable to the states through the Fourteenth Amendment) both on their face and as applied to Plaintiffs because they unconstitutionally interfere with the ability to communicate constitutionally protected speech, they compel speech to the detriment of Plaintiff businesses, they chill speech, and they impose an unconstrained prior restraint on speech.

71. The Acts violate the rights of Plaintiffs under the First and Fourteenth Amendments to the United States Constitution because they are not the least restrictive means of accomplishing any compelling governmental purpose.

72. The Acts violate the rights of Plaintiffs under the First and Fourteenth Amendments to the United States Constitution because they are substantially overbroad.

### COUNT II (All Plaintiffs)

### Violation of the Fourteenth Amendment of the United States Constitution

73. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

74. The Acts violate the rights of Plaintiffs under the Due Process Clause of the Fourteenth Amendment (procedural component) because they are impermissibly vague and fail to provide a person of ordinary intelligence fair notice of what is prohibited.

75. The Acts violate the rights of Plaintiffs under the Due Process Clause of the Fourteenth Amendment (substantive component) because they intrude into the private sexual conduct and proclivities of adults, thus impairing a fundamental right in a manner that is not the least restrictive means of accomplishing any compelling governmental purpose.

76. The Acts violate the equal protection provisions of the Fourteenth Amendment because, with no rational basis for doing so, they exempt certain news-gathering organizations while subjecting others to their every restriction.

### COUNT III (All Plaintiffs)

### Violation of the Commerce Clause of the United States Constitution

77. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

78. The Acts violate the rights of Plaintiffs under the Commerce Clause because they constitute an unreasonable and undue burden on the instrumentalities of interstate and foreign commerce.

### COUNT IV (Plaintiff JFF only)

### Violation of the Supremacy Clause and Section 230

79. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

80. The Acts violate the rights of Plaintiff JFF, a provider and user of an "interactive computer service" within the meaning of 47 U.S.C. § 230, because they effectively treat Plaintiff as the publisher or speaker of material provided by other information content providers. As 47 U.S.C. § 230(e)(3) states that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent" with Section 230, the Acts violate Section 230.

81. Article VI, Paragraph 2 of the United States Constitution (Supremacy Clause) exalts the laws of the United States as "the supreme law of the land" notwithstanding "anything in the constitution or laws of any State to the contrary." Given the direct conflict between the (Louisiana) Acts and the (federal) Section 230, the federal law must preempt the State's.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

A. Declare that the Public and Private Enforcement Acts violate the First and Fourteenth Amendments to, and the Commerce and Supremacy Clauses of, the United States Constitution;

B. Preliminarily and permanently enjoin Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from participating in the enforcement of the Acts and from failing to provide—affordably, reliably, and with sufficient privacy protections—the age-verification procedures called for by the Acts;

C. Award Plaintiffs their reasonable costs and attorneys' and other fees pursuant to 42 U.S.C. § 1988; and

D. Grant Plaintiffs such other and further relief as the Court deems just and proper.

Respectfully Submitted,

Dated: June 20, 2023

By attorneys:

*/s/ Jeffrey Sandman*
_____
Jeffrey Sandman                                  D. Gill Sperlein
LA Bar No. 39073                                 CA Bar No. 172887 (*pro hac vice* pending)
Webb Daniel Friedlander LLP            The Law Office of D. Gill Sperlein
5208 Magazine St., Ste 364                345 Grove Street
New Orleans, LA  70115                      San Francisco, CA  94102
Phone: (978) 886-0639                        Phone: 415-404-6615
e-mail: jeff.sandman@webbdaniel.law    e-mail: gill@sperleinlaw.com