# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| FREE SPEECH COALITION, INC.; DEEP CONNECTION TECHNOLOGIES, INC.; CHARYN PFEUFFER; ELIZABETH HANSON; and JFF PUBLICATIONS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> JAMES M. LE BLANC, in his official capacity as THE SECRETARY OF THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS; JAY DARDENNE, in his official capacity as THE COMMISSIONER OF THE LOUISIANA DIVISION OF ADMINISTRATION; and JEFFREY LANDRY, in his official capacity as THE ATTORNEY GENERAL OF LOUISIANA, <br><br> Defendants. | CASE NO.: 23-cv-2123 <br><br><br> SECTION E |

## REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pornhub is not a litigant in this action, but the Court would be excused for assuming otherwise. Again and again, Defendants torch the straw man pornographic tube sites, ignoring the Acts' impact on the models, writers, educators, and adult viewers who *are* the Plaintiffs here. This failure to disambiguate betrays the profound disconnect between the stated intent of the Acts and their actual impact.

**A. Defendants mischaracterize the standard of review.**

Although a movant typically carries the burden as to the preliminary injunction factors, it is the party seeking to uphold a restriction on speech that carries the burden of justifying it—even at the preliminary injunction stage. *See* Pl. Br. at 10 (citing *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). Defendants are wrong to suggest otherwise. *See* Def. Br. at 13-14.

**B. The Act is a content-based regulation of speech that cannot survive strict scrutiny.**

To endure strict scrutiny[1], the Acts must: (1) serve a compelling governmental interest, (2) be narrowly tailored to achieve it, and (3) be the least restrictive means of advancing it. *Sable Commc'ns of Cal., Inc. v. Fed. Commc'ns Comm'n*, 492 U.S. 115, 126 (1989).

    1. <u>Defendants spend much of their brief advocating for the importance of a state interest that Plaintiffs already have conceded is "compelling."</u>

Defendants reiterate at length what Plaintiffs in this case have acknowledged: The State has a compelling interest in protecting children from harmful material online. *See* Def. Br. at 3-7. Porn is indeed widely available on the internet and inappropriate for kids. No one is arguing otherwise. But "while the State has a compelling interest in protecting children, the Court also recognizes the autonomy parents possess over the rearing of their children." *Garden Dist. Book*

---

[1] It is axiomatic that content-based restrictions on speech are subject to strict scrutiny—even those aimed at protecting minors from pornography. *See, e.g., Ashcroft v. ACLU*, 542 U.S. 656 (2004); *United States v. Playboy Entm't Grp.*, Inc., 529 U.S. 803 (2000); *Reno v. ACLU*, 521 U.S. 844 (1997).

*Shop*, 184 F. Supp. 3d at 339 (citing *Ginsberg v. New York*, 390 U.S. 629, 639 (1968)).[2] Defendants give that autonomy short shrift throughout their brief.

Although Plaintiffs can quarrel with certain assertions of fact and the methodologies of the studies purporting to establish them, they amount to little of consequence here: Once the interest is identified and proven sufficiently "compelling," the inquiry turns to the "fit" by which the State has effected that interest, with the State bearing the burden of demonstrating that the Act is precisely tailored to address that interest and the least restrictive means of doing so.

2. <u>Defendants fail to demonstrate how the Act constitutes the least restrictive means of effecting Louisiana's interest.</u>

"Because the State 'bears the burden of proof on the ultimate question of [the statute's] constitutionality,' it bears the burden of demonstrating that content-filtering technology is not less restrictive or more effective." *Garden Dist. Book* Shop, 184 F. Supp. 3d at 338 (quoting *Ashcroft v. ACLU*, 542 U.S. at 666). To meet that burden, Defendants present age verification as the panacea to save kids from the scourge of online pornography: It is "cheap and getting cheaper," "safe and secure," "easy" to use (particularly in states like Louisiana with digital IDs like LA Wallet), and able to provide users with "more choices than ever before." Def. Br. at 8-10. But as with other such elixirs, the promise is stronger than the potion.

i. *"More choices than ever before!"*

Start with the illusion of choice. We're told that "the laws grant users options galore," allowing them to "choose an age-verification method that suits their own circumstances and

---

[2] *See Ginsberg,* 390 U.S. at 639 ("[C]onstitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society."); *United States v. Playboy Entertainment Group, Inc*., 529 U.S. 803, 825 (2000) (questioning whether the government had a compelling interest of its own in shielding children from sexually explicit material or just a compelling interest in aiding the efforts of those parents who wanted their children to be shielded).

preferences." Def. Br. at 12. Defendants rely on a single Declarant to introduce the buffet of options. *See* Allen Decl. (Dkt. No. 18-15). But nearly all those options fail to provide safe harbor here, as Louisiana has legislated them off the menu with an overly rigid definition of "reasonable age verification methods." *See* Supp. Boden Decl. ¶¶ 21-27 (Dkt. No. 20-1). Defendants haven't even attempted to square that definition with the supposed brave new world of age verification technologies they point to. And although new companies will continue to innovate, Louisiana simply hasn't provided the legislative latitude to accommodate them.

ii.     *"Cheap and getting cheaper!"*

Next, consider cost. Defendants suggest that "the cost per age-verification check [is] just twelve cents," with "some providers even offer[ing] age verification at no cost at all." Def. Br. at 9, 17. But their source for the claim omitted expensive setup costs from that estimate, included inexpensive "age estimation" technologies that do not qualify as "reasonable age verification methods" in Louisiana, and expressly disclaimed the estimate's relevance to pornography sites that face a unique set of verification challenges. *See* Supp. Boden Decl. ¶ 36. And although Allen purports to be "aware of some providers who offer age verification at no cost to certain sectors as part of a wider digital identity service," Decl. ¶ 45, he does not name them. Neither do Defendants. And Plaintiffs sure could use the tip: Having searched for affordable verification vendors, Plaintiff JFF settled on a service charging $1.50 *per scan*. *See* Ford Decl. ¶¶ 12-13 (Dkt. No. 9-4); Supp. Boden Decl. ¶ 37-38.

It might be that *only* LA Wallet provides a qualifying "reasonable age verification method" that is also unlikely to be evaded by a simple borrowed driver's license or credit card. But, perhaps given this monopoly position in the marketplace, LA Wallet is prohibitively expensive. Even a small website verifying north of 1,500 people per month must incur a $499

setup fee, a $999 monthly fee, and a fee of 65 cents *per scan* above the allotted 1,500. *See* Supp. Boden Decl. ¶ 39 & Ex. A (Dkt. No. 20-3).

### iii.    *"Safe and Secure!"*

Defendants' Declarant suggests that digital identity apps are being developed in accordance with national and international trust frameworks. Allen Decl. ¶ 29c. But there's no indication that LA Wallet is one of them. *See* Supp. Boden Decl. ¶¶ 29-32. In fact, the touted Age Verification Providers Association (AVPA) of which the Declarant is an audit member does not even count Envoc (or LA Wallet) among its members. *See id.* ¶ 29. Consumers are already deeply skeptical of these companies, *see id.* ¶ 34, and the supposedly uniform industry-wide duties, standards, and practices that are meant to allay those concerns simply don't apply to the State's preferred vendor.

### iv.    *But what about ... "effective?"*

Even if Louisiana had established workable parameters defining "reasonable age verification methods," Defendants still would have to demonstrate that the restrictions imposed are more effective than less restrictive alternatives like device-level filtering.[3] But Defendants have abdicated that responsibility. They insist that times have changed since the Supreme Court invalidated COPA—with age verification technology now "light years ahead of where it was in either 1999 or 2004." Def. Br. at 17. But that evolution, even by Defendants' characterization, is limited to cost (lower), privacy protection (better), and ease of use (easier). Yet there has been no concomitant evolution in the technological *effectiveness* of age-verification tools as a means of

---

[3] *See Playboy*, 529 U.S. at 813 ("If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative."); *Reno v. ACLU*, 521 U.S. at 874 ("Th[e] burden on adult speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose [of denying minors access to harmful content] that the statute was enacted to serve.").

protecting minors from harmful content online. *See* Supp. Boden Decl. ¶¶ 42-43. Defendants simply ignore the noted shortcomings in the Act's efficacy, including: (1) the simplicity of evading age-verification requirements via VPN, and (2) the abundance of harmful material— indeed, material "obscene" for *anyone*, not just minors—on the dark web that the Act does nothing to regulate. S*ee* Pl. Br. at 21. So, too, have Defendants failed to address the noted advantages that device-level filters have over site-level restrictions, including (1) their ability to preclude the above-noted circumventions, (2) their amenability to calibration to suit a particular child's age and sensitivity, and (3) improvements to the technology, affordability, availability, and customizability in the years since COPA's last invalidation *See id.* (citing Boden Decl. ¶¶ 10-15).

Rather than engage with these advantages, Defendants fall back on the well-worn contention that device-level filters aren't effective because parents aren't *using* them. *See* Def. Br. at 7. In doing so, they have managed to identify a less restrictive means by which the State might further serve its interest—namely, a public campaign to provide, educate, and encourage adoption of content filters. It's a measure that Louisiana hasn't tried. Supp. Boden Decl. ¶ 48. The Supreme Court endorsed this less intrusive alternative decades ago.[4] Faced with the identical argument that filters "place an onus on parents" who might not assume the mantle of responsibility, the Third Circuit was satisfied that the "Supreme Court has effectively answered this contention" when it declared that a court must not assume "'a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to act.'" *ACLU v. Ashcroft,* 322 F.3d at 262 (quoting *Playboy,* 529 U.S. at 805). So, too,

---

[4] *See Ashcroft v. ACLU*, 542 U.S. at 670 ("Congress can give strong incentives to schools and libraries to use [device filters]. It could also take steps to promote their development by industry, and their use by parents. . . . By enacting programs to promote use of filtering software, Congress could give parents that ability without subjecting protected speech to severe penalties.").

was M.D. La. Judge Jackson. *See Garden Dist. Book Shop*, 184 F. Supp. 3d at 338 (finding State's argument about parental difficulty with content filtering software "unpersuasive").

Neither content filters nor age verification technologies provide a fail-safe means of keeping minors away from harmful material on the internet. But one is both more effective and substantially less intrusive, assigning primary responsibility to parents instead of legislators. It's the better option here.

3.   Defendants do not even *attempt* to demonstrate how the language of the Act is narrowly tailored to serve Louisiana's interest.

Defendants seem to assume that Plaintiffs' challenge lives or dies with the Court's determination as to the availability of age-verification options.[5] But "narrow tailoring" requires more—specifically, analysis of the "fit" between the challenged regulation and the interest pursued.[6] *See* Pl. Br. at 12-19. But defendants entirely ignore this question of fit! They simply do not engage with the federal statute (COPA) that used the same statutory terms that were cut and pasted into the Louisiana Acts, nor the line of cases interpreting those terms and finding them constitutionally deficient. *See* Pl. Br. at 5-10 (tracing history of legal challenges to federal and state "harmful to minors" legislation). Of course, there isn't much for Defendants to say in this regard: Problems with the terms "as a whole" and "minor" were the basis for the Supreme Court to invalidate COPA. *See* Pl. Br. at 13-15. The chill on adult speech is the very same chill identified as the source of constitutional infirmity in that litigation. *See* Pl. Br. at 17-18. And new terms "substantial portion," "commercial entity," and "website"—expressly challenged in

---

[5] Plaintiffs addressed that question in the "least restrictive means" section of their brief to comport with the Third Circuit's organization in *ACLU v. Mukasey*, 534 F.3d 181, 190 (3d Cir. 2008)—the last word on the COPA statute's (un)constitutionality.

[6] *See also generally* Richard H. Fallon, Jr., Strict Judicial Scrutiny, 54 UCLA L. Rev. 1267, 1326-28 (2007) (characterizing "narrow tailoring" as demanding inquiries into less restrictive alternatives, underinclusiveness of the regulation, and overinclusiveness of the regulation).

Plaintiffs' brief—receive no attention from Defendants aside from a cursory mention in the *vagueness* section of their brief. *See* Pl. Br. at 15-17. Neither, for that matter, does Plaintiffs' concern about compelled speech. *See* Pl. Br. at 18-19.

This failure to engage with the bases for Plaintiffs' motion—and indeed, a critical aspect of strict scrutiny analysis—must doom Defendants' bid to enforce the Acts pending final a disposition. Even if Defendants could point to cheap and accessible tools meeting the definition of "reasonable age-verification methods" and proving more effective than content filters, the Act still would succumb under strict scrutiny absent any attempt to demonstrate that the Act's language was tailored with precision to serve the State's interest.[7]

**C.  The Act violates the Commerce Clause**

Defendants hinge their entire Commerce Clause argument on *Nat'l Pork Producers Council v. Ross*, 143 S. Ct. 1142 (2023), overstating the holding by a wide margin. The Court did *not* hold that a Commerce Clause violation "requires" discrimination against interstate commerce, *see* Def. Br. at 19—just that this antidiscrimination principle lies at the "core" of the jurisprudence. And that principle is conjured here, as Louisiana has given preferential treatment to Louisiana-based Envoc by creating one (and only one) digitized identification card, which Defendants acknowledge reflects the easiest way to access adult material online. Nor did the Supreme Court "reject[]" the line of cases holding that some instrumentalities of commerce demand uniform regulation. *See* Def. Br. at 21. Rather, it *affirmed* that line—distinguishing it from the case at bar because "[p]igs are not trucks or trains." *Ross*, Slip Copy at 17-18 n.2. With their glib suggestion that "porn websites" aren't either, Defendants ignore the real and pressing concern about patchwork state-by-state regulation of the internet. Nowhere in *Ross*, or any

---

[7] Defendants' failure to defend the statutory tailoring betrays a substantial disconnect between the problem and the solution. *See* Supp. Boden Decl. ¶¶ 46-47.

volume of the U.S. Reports, is the "instrumentalities" line limited to concerns over transportation alone. And perhaps no instrumentality of commerce is as fundamental to frictionless interstate commerce in the 21st Century than the internet.

### D.  The Act is substantially vague and overbroad.

Defendants suggest that because some of the Act's terms (*e.g.,* "contemporary community standards"[8] and "as a whole") come from the *Miller* Test, they are therefore sufficiently precise to pass constitutional muster. The Supreme Court has expressly rejected that logic.[9] In fact, the *Reno* and *Ashcroft* Courts interpreted these same terms and found them constitutionally wanting. Defendants do not explain why a different result should follow here. Nor do they have an answer for Plaintiffs' concerns over the vagueness of the Act's other terms that do *not* come from the Supreme Court's *Miller* Test (*e.g.,* "commercial entity," "website," "substantial portion," "commercially reasonable," and "minor"). *See* Pl. Br. at 23-25. The "adult

---

[8] Defendants are simply wrong to assert (1) that "[b]ecause *Miller* addressed a state statute, the phrase 'contemporary community standards' means the standards of the state as a whole," and (2) that, as "the representative body of the entire State," the "Legislature . . . is therefore empowered to define the State's community standards." Def. Br. at 23. In fact, the Supreme Court has held that a state may choose to define an obscenity offense in terms of "contemporary community standards . . . without further specification" (leaving it to the *jury* to determine the bounds of that community), or "it may define the standards in more precise geographical terms." *Jenkins v. Georgia*, 418 U.S. 153 (1973). Of course, it betrays a fundamental misunderstanding about what a constitutional right entails to suggest that the legislature may "define the state's community standards." *That* is, and must be, a job for the jury. *See Smith v. United States*, 431 U.S. 291, 305 (1977) (holding that "contemporary community standards must be applied by *juries* in accordance with their own understanding of the tolerance of the average person in their community").

[9] *See Reno v. ACLU*, 521 U.S. at 872–74 ("The Government argues that the statute is no more vague than the obscenity standard this Court established in *Miller v. California* . . . . The Government's reasoning is [] flawed. Just because a definition including three limitations is not vague, it does not follow that one of those limitations, standing by itself, is not vague. . . . The Government's contention that courts will be able to give such legal limitations to the [statute's] standards is belied by *Miller*'s own rationale for having juries determine whether material is 'patently offensive' according to community standards: that such questions are essentially ones of *fact*.") (emphasis in original).

business" cases Defendants cite offer scant support where the vagueness challenges there focused only on the term "substantial portion" and only within the context of brick-and-mortar stores with measurable square footage and countable products on its shelves. The term "substantial portion" in those cases was not further confused by a clumsy definition inviting more questions than answers as to what should be included when comparing "material harmful to minors" to other material. *See* Pl. Br. at 23. By transposing analog ideas into a digital world with little or no consideration for the complications involved, Louisiana has introduced a level of vagueness and overbreadth that the Constitution does not permit.

**E.   Defendants fail to rebut Plaintiffs' arguments as to the other preliminary injunction considerations.**

Defendants contend that "[d]elay and compliance are not indicative of irreparable harm," citing cases recognizing only that delay in seeking a preliminary injunction can provide, at best, "some evidence" that the harm asserted is unsubstantiated. *See Boire v. Pilot Freight Carriers, Inc.,* 515 F.2d 1185, 1193 (5th Cir. 1975); *See* Def. Br. at 25-26. More importantly, because each of those cited cases involved *private defendants*, the plaintiffs' asserted harms did not take on a constitutional dimension. But this case involves First Amendment injuries inviting a *presumption* of irreparable harm applied by the Supreme Court and 5th Circuit alike. *See* Pl. Br. at 27 (citing cases). A few months' delay is insufficient to defeat that presumption—particularly when delay is attributable to (1) difficulties identifying co-plaintiffs and appropriate counsel, and (2) indications (eventually borne out) that the State would soon pass a public enforcement version of the statute that could be challenged at the same time with patience from the litigants. *See* Supp. Boden Decl. ¶¶ 49-51. Plaintiffs then filed their complaint and this motion just *12 days* after the Public Enforcement Act was signed into law.

Aside from a few of the largest adult websites,[10] most providers of content (pornographic and otherwise) that might be swept up by the Acts have *not* begun age-verifying their users. *See* Supp. Boden Decl. ¶ 40. Either decision—compliance or defiance—carries consequences irreparable with dollars and cents. *Noncompliance* subjects providers to the risk of imminent lawsuits and civil enforcement actions whereas *compliance* requires foregoing communications with audiences they are constitutionally entitled to reach—whether older minors (in the case of Plaintiff O.school) or adults who are uncomfortable entering personal information before accessing erotic materials (in the case of Pfeuffer, JFF, and FSC's members). *See Ashcroft v. ACLU*, 542 U.S. at 670–71 ("Where a prosecution is a likely possibility, yet only an affirmative defense is available, speakers may self-censor rather than risk the perils of trial. There is a potential for extraordinary harm and a serious chill upon protected speech.").

Finally, and contrary to Defendants' suggestion, that harm to Plaintiffs need not outweigh the State's interest in seeing the statute enforced. Were *that* the hurdle, a preliminary injunction *never* would issue in cases where the State could articulate a compelling interest supporting its law. The State's harm is instead properly framed as that resulting from the temporary disruption of its enforcement scheme.[11] And courts are not so charitable to the government when conducting this balancing. *See* Pl. Br. at 27-28. This Court should lend no additional grace here.

---

[10] Plaintiffs routinely reference Pornhub, YouPorn, and RedTube—all of which are owned by the same company (Mindgeek) and employ the same proprietary age-verification architecture (AllPassTrust, which works with LA Wallet).

[11] *See Ashcroft v. ACLU*, 542 U.S. at 671 ("The harm done from letting the injunction stand pending a trial on the merits . . . will not be extensive. No prosecutions have yet been undertaken under the law, so none will be disrupted if the injunction stands. Further, if the injunction is upheld, the Government in the interim can enforce obscenity laws already on the books.").

Respectfully Submitted,

By      */s/ Jeffrey Sandman*

Date: July 21, 2023

                                            _____

Jeffrey Sandman (LA Bar No. 39073)
Webb Daniel Friedlander LLP

D. Gill Sperlein (*pro hac vice* pending)
The Law Office of D. Gill Sperlein

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2023, I electronically filed the foregoing by using the Court's

electronic filing system, which will send a notice of electronic filing to all counsel of record for

Defendants.

By      */s/ Jeffrey Sandman*

_____

Jeffrey Sandman (LA Bar No. 39073)
Webb Daniel Friedlander LLP

11