## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| FREE SPEECH COALITION, INC.; DEEP CONNECTION TECHNOLOGIES, INC.; CHARYN PFEUFFER; ELIZABETH HENSON; and JFF PUBLICATIONS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>JAMES M. LE BLANC, in his official capacity as THE SECRETARY OF THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS; JAY DARDENNE, in his official capacity as THE COMMISSIONER OF THE LOUISIANA DIVISION OF ADMINISTRATION; and JEFFREY LANDRY, in his official capacity as THE ATTORNEY GENERAL OF LOUISIANA,<br><br>Defendants. | CASE NO.: 23-cv-2123<br><br>SECTION E |

### SUPPLEMENTAL DECLARATION OF ALISON BODEN

ALISON BODEN DECLARES:

16. I am the Executive Director of the Free Speech Coalition (FSC), a Plaintiff in this action. I submit this supplemental declaration on behalf of FSC, its members, and the viewers of their material, in support of Plaintiffs' Motion for a Preliminary Injunction against enforcement of La. R.S. § 9:2800.29 and La. R.S. § 51:2121 (collectively, the "Acts").

17. I have read the Acts, including the statutory definitions referenced therein. I understand that violation of the Acts exposes the violator either to liability for "damages resulting

1

from a minor's accessing the material" (in the case of La. R.S. § 9:2800.29) or "civil penalties" imposed pursuant to an action brought by the attorney general (in the case of La. R.S. § 51:2121).

18. I have read the briefing on Plaintiffs' motion for preliminary injunction, including Plaintiffs' motion and memo in support of same, Defendants' response, and Plaintiffs' reply. I have read all declarations offered in support of any party, and I have read most, but not all, of the other exhibits provided by Defendants.

19. I have personal knowledge of the facts set forth in this supplemental declaration, which I submit to address claims made by Defendants and their declarants that I know to be inaccurate, incomplete, or misleading.

20. Before joining FSC, I was professionally involved in the adult entertainment industry for 20 years in various capacities, including as a small business owner, marketer, product manager, software developer, manager, and chief executive officer. Although I am not a lawyer, I have experience reading legislation and parsing academic scholarship—particularly as it relates to technology and the adult industry.

**The Verification Options Identified by Defendants Either Do Not Qualify as "Reasonable Age Verification Methods" or Are Plainly Ineffective in the Context of Protecting Minors From Online Material.**

21. Defendants' Declarant Tony Allen identifies "a wide range of non-exclusive methods that Content Providers and Third-Party Servicers can adopt to assure the ages of their users to varying degrees of certainty." Allen Decl. ¶ 29 (Dkt. No. 18-15). But on my reading of the Acts, nearly all of them do not constitute "reasonable age verification methods" as defined.

22. Specifically, "Vouching" (*id.* ¶ 31b.), "Physical checks" (*id.* ¶ 31a.), "Attestation / self-declaration" (*id.* ¶ 30b.), "Social Proofing / algorithmic profiling" (*id.* ¶ 30a.),

2

"Submission of [a] Credit Card number" (*id.* ¶ 29d.), and "Age estimation via facial, voice, or behavioral analysis" (*id.* ¶ 29f.) plainly do not meet the State's definition of "reasonable age verification methods."[1] I know these tools to be widely used in other states and other industries, but the Acts make no provision for them.

23. Nor do the Acts make room for "Review of bank records" (*id.* ¶ 29e.), which does not seem to require reference to "government-issued identification" or a user's public or private "transactional data" (as that term is defined).[2]

24. That leaves three methods, identified by Allen, that arguably constitute "reasonable age verification methods: "Review of Government Issued Documents" (*id.* ¶ 29a.), "Review of Credit reports and other private sector databases" (*id.* ¶ 29b.), and "Review of digital identity apps" (*id.* ¶ 29c.). Yet each of these options is fraught with problems, too.

25. Verification via "Review of Government Issued Documents" would, working alone, hardly suffice to keep kids away from harmful material on the internet. If a driver's license or state ID were sufficient, then any child could access harmful material online by taking a quick photograph of a parent's license (or, indeed, any adult's ID). And although Allen notes that a "photo on the document can also be compared to a freshly taken photo

---

[1] The Acts limit "reasonable age verification methods" to the use of a (a) "digitized identification card" or (b) "commercial age verification system" that verifies the age of the user via reference to (i) "government-issued identification" or (ii) another "commercially reasonable method that relies on public or private transactional data."

[2] The Acts define "transactional data" as "a sequence of information that documents an exchange, agreement, or transfer between an individual, commercial entity, or third party used for the purpose of satisfying a request or event," including "records from mortgage, education, and employment entities."

or video of the user" (a so-called "liveness" check), nothing in the Act demands this or any other additional step beyond mere authentication of the ID provided.[3]

26. To verify via "Review of Credit reports and other private sector databases," Allen notes that "users usually enter their name, address, and date of birth . . . and a search is made of credit reports or other reliable databases to confirm the details are accurate and obtain or confirm the date of birth." *Id.* ¶ 29b. Typically, however, "this form of check is used where the user will need to be located at the address claimed as part of this process, to prevent users entering the information of other people, so it is well suited to the delivery of age-restricted goods." *Id.* (emphasis added). For the same reason, it is particularly *ill-suited* to the provision of digital passage online, as the user may simply provide a parent's or another adult's personal information to see the site gates fling open. So, too, is this method incapable of age-verifying substantially all adult users, many of whom lack the credit histories to appear on a credit report or the digital footprints to appear on "other private sector databases"—whatever those might be.

27. That leaves "Review of digital identity apps" as an available verification tool that qualifies as a "reasonable age verification method" and which is not evaded with a simple borrowed driver's license. The only such application available in Louisiana is LA Wallet, developed by the Baton Rouge-based company Envoc.

**The Suggested Industry-Wide Uniformity in Duties, Standards, and Practices Does Not Apply to Louisiana Vendors**

---

[3] Allen also notes that documents equipped with NFC chips may provide the highest levels of assurance. *See* Allen Decl. ¶ 29b. In the United States, these state-issued documents are called Enhanced Drivers Licenses. *See* U.S. Dept. of Homeland Security Website, "Enhanced Drivers Licenses: What Are They?" *available at:* https://www.dhs.gov/enhanced-drivers-licenses-what-are-they. They are available only in five states—Michigan, Minnesota, New York, Vermont, and Washington—but not Louisiana.

28. To create LA Wallet, "Envoc mobile developers worked closely with the Louisiana OMV, general counsel, the state's Office of Information Technology, and state officials[.]" *See* Fabre Decl. ¶ 7 (Dkt. No. 18-16).

29. Allen suggests that digital identity apps, "including the LA Wallet, are being developed in accordance with ISO/IEC 18013-5:20213 or through various Trust Frameworks, such as the DIACC4 in Canada or the DIATF5 in the United Kingdom." Allen Decl. ¶ 29c. But he offers no citation, or even additional detail, to support the claim. Neither does Calvin Fabre, the founder, president, and CEO of Envoc. *See generally* Fabre Decl. In fact, the Adult Verification Provers Association (AVPA)—a "global trade association representing the age assurance industry" of which Allen is an audit member—does not count either Envoc or LA Wallet among its members.[4]

30. As such, the supposedly uniform industry-wide privacy duties, standards, and practices that Allen references[5] do not even apply to LA Wallet.

31. Other claims from Allen about industry-wide privacy and security are spurious at best. He asserts that "age verification providers apply the same degree of security expected in financial transactions." Allen Decl. ¶ 47. But there is neither evidence nor requirement that they do so. He writes that "age verification companies have a duty of care around the

---

[4] *See* Adult Verification Provers Association Website, "Services offered by AVPA members," *available at*: https://avpassociation.com/av-clients/providers/ (identifying AVPA members).

[5] *See, e.g.*, Allen Decl. ¶ 46 ("Age Assurance Providers who are members of AVPA and, thus sign up to its code of conduct, do not create new databases when conducting age checks for the adult industry."); *id.* ¶ 48 ("[A]ge verification companies have a duty of care around the protection of personal data and demonstrate their adherence to this through various forms of certification[.]"); *id.* ¶ 50 ("In addition to local laws, such as GDPR in the UK and EU, there is an industry-wide certification protocol, operated by government approved auditors, which tests providers against international standards." (emphasis added); *id.* ¶ 53 ("The members of AVPA . . . are engaging with CNIL to add more robust cryptographic protections[.]").

protection of personal data and demonstrate their adherence to this through various forms of certification[.]" *Id.* ¶ 48, 50. But he does not identify a legal source of this duty, and I do not know of one; and while certifications might be necessary in some European countries, they are *not* required in the United States (or Louisiana specifically). He asserts that "the industry's general practice is[] not to retain any personal information after an age check is completed." *Id.* ¶ 46. But that's no binding command. And although the Private Enforcement Act subjects a commercial entity to damages "resulting from retaining the identifying information," any such breach will be difficult to discover, and any resulting damages will be difficult to quantify. Whether this provision even applies to third-party age verifiers is questionable.[6]

32. Likewise, Envoc's Founder, President, and CEO offers tepid assurances about the security of the LA Wallet. He writes that LA Wallet "anonymously answer[s] age challenges from content providers while remaining agnostic about who is being challenged, and what web site is issuing the challenge." Fabre Decl. ¶ 15. But in my professional experience as a software engineer, it would be highly unusual for LA Wallet *not* to keep logs that would allow them to identify the websites requesting verifications and the individuals being verified, even in an "anonymized" or "pseudonymized"[7] form.

---

[6] The statute instructs that "a commercial entity or third party that performs the required age verification shall not retain any identifying information" in §2800.28(B)(2) but ostensibly only provides a remedy against "a commercial entity" in (B)(3)(b).

[7] *See* International Association of Privacy Professionals (IAPP) Website, "Looking to comply with GDPR? Here's a primer on anonymization and pseudonymization," *available at*: https://iapp.org/news/a/looking-to-comply-with-gdpr-heres-a-primer-on-anonymization-and-pseudonymization/ (discussing the dangers of anonymized/pseudonymized data being "re-identified" to the point where it can again be attributed to an individual).

Failing to do so would impair LA Wallet's ability to monitor suspicious activity, stop attacks in progress, and investigate security breaches when they occur.

33. Fabre notes that "LA Wallet was not affected by the recent MOVEit data breach" affecting the Louisiana OMV. *Id.* ¶ 18. But that attack, which exposed the private data of 6 million Louisianans, just underscores that *any* system can be breached. Fabre himself has acknowledged publicly that "hacking is always, always a possibility."[8]

34. High profile breaches of the sort produce diminished consumer confidence in the privacy of their information and the safeguards applied by those with access to it, creating a substantial chill in the exercise of protected expression. Research conducted by the European Commission found that more than half of all participants were unwilling to share their official documents with a website for age verification purposes.[9]

35. Another study identified "a number of cases where data breaches (through hacking and malware for example) have resulted in users' pornography consumption patterns being used for blackmail."[10] The sensitive nature of this material renders it ripe for attack, and consumer concerns about the safety of their most sensitive information are not unjustified.

---

[8] *See* Megan Wyatt, "Want to watch porn in Louisiana? You'll need LA Wallet and that's raising privacy concerns," THE ACADIANA ADVOCATE, (January 13, 2023), *available at*: https://www.theadvocate.com/acadiana/news/politics/louisiana-residents-now-need-la-wallet-to-access-porn-online/article_295d1c54-91f1-11ed-a0a6-83adbe726bc2.html.

[9] euCONSENT, Electronic Identification and Trust Services for Children in Europe, "Pilot Execution Report," (August 5, 2022) (Page 12), *available at:* https://euconsent.eu/download/pilot-execution-report-third-euconsent/.

[10] *See* Majid Yar, "Protecting Children from Internet Pornography? A Critical Assessment of Statutory Age Verification and Its Enforcement in the UK," POLICING: AN INTERNATIONAL JOURNAL, 43, no. 1 (November 15, 2019) (pages 183–97), *available at:* https://doi.org/10.1108/PIJPSM-07-2019-0108.

**Current Age Verification Tools Are Expensive.**

36. Allen and Defendants repeatedly suggest that age verification costs "between zero and twelve cents per user." Def. Br. at 9, 17; Allen Decl. at ¶ 45. They reference (but for some reason do not cite) a UK Government impact assessment that, on closer inspection, includes in its estimate only *part* of the total cost. *See* Online Safety Bill Impact Assessment[11] (IA) ¶ 184 ("There may be additional costs (not captured above) of integrating age verification solutions within each in-scope platform."). Likewise, the IA's estimate includes only *part* of the market requiring age verification services—and explicitly *not* pornography sites. *See* IA ¶ 177-78 ("When it comes to dedicated pornography sites, evidence suggests that age assurance technologies (and in particular age verification) are rare . . . and it is not possible at this stage to fully monetise the impact of the potential employment of age assurance solutions by some platforms in scope of the child safety duties and pornography provisions[.]"). Finally, the estimate reflects costs of age assurance across *all available* technologies—including "age estimation," *see* IA ¶ 172—which, while substantially cheaper than "age verification," is not an authorized "reasonable age verification method" under the Act.

37. Although Allen purports to be "aware of some providers who offer age verification at no cost to certain sectors as part of a wider digital identity service," Allen Decl. ¶ 45, he does not name even one of them. I know of no vendors offering to verify hundreds of thousands of government IDs every month for free, either.

---

[11] Online Safety Bill, "Impact Assessment," (January 31, 2022), *available at:*
https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/1061265/Online_Safety_Bill_impact_assessment.pdf.

38. Those vendors of which I *am* aware are <u>expensive</u>. In my earlier declaration, I identified eight such vendors, provided links to their pricing, and prepared a table revealing the price for certain numbers of verifications. *See* Boden Decl. at 4 (Dkt. No. 9-2). Those costs range from about 45 cents on the low end to two dollars on the high end, and they do not factor in startup expenses. The costs can quickly become exorbitant—dwarfing expected revenue in most cases. *See* Ford Decl. ¶¶ 12-14 (Dkt. No. 9-4).

39. LA Wallet is no more affordable for content providers. LA Wallet's Price Sheet, attached as Ex. A, reveals service plans that are cost-prohibitive for any sized online content provider. And these are just the costs imposed *by* LA Wallet; but the website also must integrate LA Wallet's API (application programming interfaces) for it to work. In their Online Safety Bill Impact Assessment, the UK government advises that "between one and three developers are required" in order to complete a third-party age verification software integration.[12] This might amount to a manageable fixed cost for the larger content providers but prove cost-prohibitive for the smaller ones.

40. It should come as no surprise then that, as Allen notes, the "major porn sites operating in Louisiana have implemented provisions to address the requirements of the Private Enforcement Act." Allen Decl. ¶ 69. From conversations with leaders of adult content companies big and small, I know that the only companies complying are those with the financial wherewithal, technical infrastructure, and volume of traffic to achieve economies of scale that are unavailable to smaller players. The Acts therefore give the largest adult sites a substantial competitive advantage over the smaller ones and make no accommodation whatsoever for the models, writers, and educators who will find

---

[12] *See* "Impact Assessment," *supra* note 11, ¶ 184.

themselves regulated by legislation that does not seem intended for them (like Plaintiffs O.school and Pfeuffer).

41. LA Wallet is free to the user . . . at least for now. *See* Fabre Dec. ¶ 45. But there is no requirement that it remain so, and Envoc wouldn't be the first company to lure users with a deal, capture the market, and raise prices. In fact, the statute that created the opportunity for a digital ID in Louisiana anticipates imposition of fee, capping it at six dollars per user. *See* La. R.S. § 39:17.3.

## Age Verification Is Easily Evaded and Ineffective.

42. Allen references a 2022 article[13] by the French Data Protection Authority CNIL and notes AVPA's engagement with CNIL to "add more robust cryptographic protections." Allen Decl. ¶¶ 51-53. But, as that article indicates, CNIL has been extremely critical of the age verification industry, acknowledging that "current [age verification] systems are circumventable and intrusive," calling for "the implementation of more privacy-friendly models," and recognizing that "all the solutions proposed can easily be circumvented" by "use of a simple VPN locating the Internet user in a country that does not require an age verification[.]"[14] CNIL scoured the landscape for age verification providers offering "sufficiently reliable verification, complete coverage of the population, and respect for the protection of individuals' data and privacy and their security"—finding "*no solution that satisfactorily meets these three requirements*."[15]

---

[13] *See Commission Nationale de l'Informatique et des Libertés* (CNIL) Website, "Online age verification: balancing privacy and the protection of minors," (September 22, 2022), *available at*: https://www.cnil.fr/en/online-age-verification-balancing-privacy-and-protection-minors.
[14] *Id.*
[15] *Id.*

43. Other peer-reviewed scholarship identifies these (and other) shortcomings with age verification as a tool to keep children away from harmful material on the internet. One study[16] notes that "substantial volumes of pornography are available via Torrent sites that enable (and indeed champion) anonymous access"—exposing minors to "huge quantities of pornographic material on channels other than those regulated by the age-verification requirements[.]" It recalls that, "as journalists from the Guardian newspaper revealed, the age-verification procedures 'can be circumvented in minutes' by using an e-mail address and 'a non-existent credit card number.'" The study documents the explosion in popularity of virtual private networks (VPNs), with at least one free web browser (called Opera) including "built-in VPN functionality that enables users to access the internet from a menu of IP addresses in Europe, the Americas and Asia." The conclusion? Evading age verification tools is "so easy that the children the law is meant to protect won't find any difficulties in subverting its purpose." As a result, age verification requirements might be making the web *more* dangerous for minors, as "the UK Government's Depart of Media Culture and Sport, in its impact assessment of the requirements, [] noted that 'Adults (and some children) may be pushed towards using Tor (dark web) and related systems to avoid AV [age verification] where they could be exposed to illegal and extreme material that they otherwise would never have come into contact with.'"

**Age Verification Products and Services Are Difficult for Consumers to Use.**

44. According to its creator, the LA Wallet verification process "is convenient and usually takes about a minute." Fabre Decl. ¶ 13. But users do not tolerate such delays in

---

[16] *See* Yar, "Protecting Children," *supra* note 10.

11

accessing the content they want. According to Google, "the probability of bounce increases 32% as page load time goes from 1 second to 3 seconds."[17] When that "lag" is stretched to a minute, users will find shortcuts to their desired material—including by circumventing the age-verification requirements via VPN. Indeed, daily demand for VPN services skyrocketed in Louisiana immediately upon the Private Enforcement Act's effective date and the decision of Mindgeek (owner of PornHub, YouPorn, and RedTube adult sites) to age-verify its Louisiana users.[18]

45. Allen notes that "websites and apps that do not have user accounts need not force their users to repeat age-assurance process each time the user tries to access the website or app because they can recognize when a user has previously completed an age check and rely on that check again." Allen Decl. ¶ 60; *see also* Def. Br. at 9. But the technology to accomplish this does not exist commercially. Indeed, Allen himself admits that the only assessment of whether this functionality is even technically feasible is a single proof of concept project funded by the European Commission. Allen Decl. ¶ 39. He does not mention, however, the substantial difficulties that users had verifying their ages at all.[19]

### Content Filters Remain the Most Effective Way to Keep Children Away From Harmful Material

---

[17] Think with Google Website, "Marketing Strategies," Google/SOASTA Research (2017), *available at:* https://www.thinkwithgoogle.com/marketing-strategies/app-and-mobile/page-load-time-statistics/.

[18] Dejan Cvetnarevic, "Daily VPN Demand in Louisiana Increases After Act 440," VPN CENTRAL, (February 7, 2023), *available at:* https://vpncentral.com/daily-vpn-demand-increase-louisiana/.

[19] *See* euCONSENT Report, *supra* note 9, Page 10 (noting failure rate of 21% among parents attempting to reuse prior successful age verification).

46. Defendants claim that kids are just "three clicks away" from pornography on the internet. Def. Br. at 3 n.1. They cite a 2013 article characterizing a Kaspersky Lab study on access to "explicit material" of any sort. Yet the kids navigating YouTube in that study weren't three clicks away from *porn*, but from nudity ("footage of a woman giving birth") and violence ("a music video featuring swearing and guns"). Neither constitutes "material harmful to minors," at least as I understand the Acts. More importantly, nothing in the Acts will remedy the phenomenon (to the extent it even exists) of explicit YouTube videos remaining just a few clicks away from a child user unless Defendants are prepared to assert that at least one-third (a "substantial portion") of YouTube's content—however that is to be measured—constitutes "material harmful to minors" such that YouTube itself would be responsible for age-verifying its users.

47. The researchers of that cited Kaspersky Lab study concluded in a press release[20] that their results "highlight the potential risks such sites [like YouTube] pose if *parental controls are not activated* or children are left unattended while browsing." For that reason, they concluded that "[h]aving parental controls in place is vital and can be highly effective in combatting objectionable material." In other words, the study makes the case for parental controls, not government-imposed age-verification requirements.

48. In my first declaration, I identified a host of free and commercially available content filtering applications, their included features, and resources to help parents select the most appropriate applications for their families and instructions for how to use them. *See*

---

[20] *See* Kaspersky Lab Press Release, "Children at High Risk of Accessing Adult Content on YouTube," (February 5, 2013), *available at*: https://www.prnewswire.com/news-releases/children-at-high-risk-of-accessing-adult-content-on-youtube-189770621.html (emphasis added).

Boden Decl. ¶ 10-14. To my knowledge, Louisiana has done *nothing* to provide content filters to parents (at reduced cost or otherwise), to educate parents on their features and functions, or to encourage parents to install them on the devices used by their children.

**Plaintiffs Filed Their Lawsuit and Motion For Preliminary Injunction As Soon As Appropriate Counsel and Willing Co-Plaintiffs Were Identified.**

49. FSC did not delay in bringing this lawsuit. We are a small organization with only one full-time employee and one contractor to handle our entire industry's legislative priorities all across the United States (including a major federal effort aimed at eliminating banking discrimination against sexually-explicit content creators). We have an extremely limited budget and are unable to afford the costs and fees of litigation. Only with the aid of pro bono counsel have we been able to pursue this litigation. Those counsel took time to locate, and I understand they have other litigation priorities from paying clients, too.

50. Moreover, although it was apparent to me that the earlier-passed statute (the Private Enforcement Act) would impact FSC members, it was just as clear that it also would impact models, writers, and educators who are *not* FSC members. Locating willing co-Plaintiffs to join took some time, as well.

51. Once we were prepared to challenge the Private Enforcement Act, we learned that La. Rep. Schlegel had introduced what would become the Public Enforcement Act in the Louisiana House. Rather than challenge both statutes piecemeal, we decided to wait for the passage of that statute and challenge them together. We filed our complaint and motion for preliminary injunction just 12 days after the Governor signed that latter bill into law.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at <u>San Francisco</u>, <u>CA</u> on <u>Jul 21, 2023</u>.
                   City                  State                Date

_/s/ Alison Boden_
Alison Boden

15