# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

FREE SPEECH COALITION, INC.; DEEP
CONNECTION TECHNOLOGIES, INC.;
CHARYN PFEUFFER; ELIZABETH
HANSON; and JFF PUBLICATIONS, LLC,

          Plaintiffs,

          v.

JAMES M. LE BLANC, in his official
capacity as THE SECRETARY OF THE
LOUISIANA DEPARTMENT OF PUBLIC
SAFETY AND CORRECTIONS; JAY
DARDENNE, in his official capacity as THE
COMMISSIONER OF THE LOUISIANA
DIVISION OF ADMINISTRATION; and
JEFFREY LANDRY, in his official capacity
as THE ATTORNEY GENERAL OF
LOUISIANA,

          Defendants.

CASE NO.: 23-cv-2123

SECTION E

JUDGE SUSIE MORGAN

MAG. JUDGE DONNA
PHILLIPS CURRAULT

## INTRODUCTION

With little dissent, the Louisiana Legislature enacted two patently unconstitutional laws ("the Acts") reflecting the same moral panic and dusted-off statutory language that the Supreme Court invalidated several decades ago. The twist this time was its attempt to shield the first of those laws (the "Private Enforcement Act") from challenge by removing the most obvious state actors from its enforcement and instead empowering private citizens to do the State's bidding in shutting down access to disfavored material within the State. Right on cue, the Defendants have moved to dismiss the suit, insisting that Plaintiffs wait patiently to be sued in state court and assert their constitutional claims as defenses there. Never mind that with that proscribed course, any chill on protected speech is unaddressable, any costs undertaken to comply with the Act are irretrievable, and any risk in defying it is taken at the peril of the violator.

That was, of course, the Legislature's intent. And while Defendants present this as a simple case of "right claims, wrong defendants," if they're vindicated in that position, then "[r]ights that exist in name will increasingly fall vulnerable to flouting in the absence of political commitments to enforcing them." *See* Richard H. Fallon, Jr., Constitutional Remedies: In One Era and Out the Other, 136 Harv. L. Rev. 1300, 1306, 1308 (2023). Fortunately, this Court need not strain the reasoning of recent precedents to permit Plaintiffs' constitutional challenge to proceed, because while Louisiana's efforts to eliminate review were well-built, they weren't airtight. Plaintiffs have presented a live case and controversy ripe for adjudication and addressed to state actors who, per *Ex Parte Young*, 209 U.S. 123 (1908), are appropriate defendants outside the protection of the State's sovereign immunity.

## FACTUAL BACKGROUND

The Acts place substantial burdens on Plaintiff website operators, content creators, and countless others who use the internet by requiring websites to age-verify every internet user

before providing access to non-obscene material that meets the State's murky definition of "material harmful to minors." Both Acts impose liability upon a "commercial entity that knowingly and intentionally publishes or distributes material harmful to minors on the Internet from a website that contains a substantial portion of such material . . . [where] the entity fails to perform reasonable age verification methods to verify the age of an individual attempting to access the material." Whereas the Private Enforcement Act creates a private right of action for "damages resulting from a minor's accessing them material," the Public Enforcement Act empowers the Attorney General to "conduct an investigation of the alleged violation and initiate a civil action . . . on behalf of the state to assess civil penalties."

In challenging the constitutionality of both Acts, Plaintiffs have sued three Defendants—the Commissioner of the Division of Administration (DoA), the Secretary of the Department of Public Safety and Corrections (DPSC), and the Attorney General (AG). Questions of state sovereign immunity and Plaintiff standing in this case depend, in part, on those Defendants. Although they are repeated where relevant in this brief, those duties are as follows.

## A. Duties of Commissioner Dardenne (Division of Administration)

The Division of Administration (DoA) is "a division of the office of the governor" that "shall exercise" certain powers and functions as "provided by law," La. R.S. § 39.1, including "all administrative functions of the state in relation to the duties outlined in law," save for few enumerated exceptions, La. R.S. § 39.4.

"The office of technology services is established within the division of administration . . . [and] headed by the state chief information officer . . . [who] shall report to the commissioner of administration concerning his responsibilities[.]" La. R.S. § 39:15.2. The Office of Technology's duties are vast, including

- Facilitating and fostering innovative applications of emerging technologies that provide cost-effective solutions for improving government operations and services.
- Reviewing and overseeing information technology projects and systems for compliance with statewide strategies, policies, and standards, including alignment with state government's business goals, investment, and other risk management policies.
- Overseeing and coordinating access to state information that is electronically available online from agency web sites.
- Identifying information technology applications that should be statewide in scope, and ensuring that these applications are not developed independently or duplicated by individual state agencies of the executive branch.
- Acting as the sole centralized customer for the acquisition, billing, and record keeping of information technology systems or information technology services provided to state agencies.

La. R.S. § 39:15.3(B)(10-21).

As explained on the Division of Administration website, "[i]n 2018, the Louisiana Office of Technology Services worked alongside the Office of Motor Vehicles and other entities to implement the LA Wallet initiative, culminating in the development of a digital driver's license application that is supported by both Apple iOS and Android."[1] "As of Dec. 22, 2020, LA Wallet has been considered a legal equivalent to a physical license or identification[.]" *Id.*

And as part of the Division's management of the State's digitized credentialing program, "[t]he commissioner of administration shall promulgate rules and regulations to implement the program and to develop the accessibility of any digitized credential available for use in an electronic wallet." La. R.S. § 39:17.2. And "[r]ules and regulations shall be promulgated . . . as may be necessary to carry out the provisions" outlining the broader duties of the Office of Technology Services. La. R.S. § 39:15.2.

**B.  Duties of Secretary LeBlanc (Department of Public Safety and Corrections)**

---

[1] *See* La. Div. of Admin., "Tech Spotlight: LA Wallet," *available at:* https://www.doa.la.gov/doa/ots/tech-spotlight/la-wallet/.

The Department of Public Safety and Corrections (DPSC) administers the Office of Motor Vehicles, La. R.S. § 36:401(C), which "shall perform the functions of the state relative to the examination and licensing of drivers of motor vehicles within the state," La. R.S. § 36:408. DPSC is led by the Secretary, La. R.S. § 36:403, who "is responsible for the functioning and control of all programs within the Department"; "formulates rules and regulations and determines policy regarding management, personnel, and total operations"; and "leads and supports central office and field unit staff, which are charged with carrying out the work of the agency."[2]

Both the Private and Public Enforcement Acts require "reasonable age verification methods," which are expressly satisfied where "the person seeking to access the material" is required to provide "a digitized identification card as defined in R.S. § 51:3211." La. R.S. § 9:2800.29(D)(8) and La. R.S. § 51:2121(D)(8). The cross-referenced statute defines "digitized identification card" as "a data file available on any mobile device which has connectivity to the internet through a state-approved application that allows the mobile device to download the data file from the Department of Public Safety and Corrections or an authorized representative of the Department of Public Safety and Corrections that contains all of the data elements visible on the face and back of a license or identification card and displays the current status of the license or identification card." La. R.S. § 51:3211.

Like other executive agencies in Louisiana, DPSC "shall cooperate with the office of technology services and provide assistance as required" to "accomplish the work" of that office—including its administration of LA Wallet. La. R.S. § 39:15.3(C). That assistance

---

[2] *See* DPSC, "Office of the Secretary," *available at:* https://doc.louisiana.gov/about-the-dpsc/.

necessarily requires providing access for LA Wallet to "download the data file" from the DPSC. Without this assistance, LA Wallet simply wouldn't function.[3]

### C.  Duties of Attorney General Landry

The Louisiana Constitution requires a "Department of Justice, headed by the attorney general, who shall be the chief legal officer of the state." La. Const. Art. 4, § 8. "As necessary for the assertion or protection of any right or interest of the state, the attorney general shall have authority [] to institute, prosecute, or intervene in any civil action or proceeding; . . . [or] to supersede any attorney representing the state in any civil or criminal action." *Id.* "The attorney general shall exercise other powers and perform other duties authorized by this constitution or by law." *Id.*

The structure and duties of the DOJ is further explained by statute at La. R.S. 36:701 *et seq.* It includes the Civil Division, which is responsible, *inter alia,* for "providing the full range of civil legal services requested by the officers and agencies of the state," for "the assertion or protection of any right or interest of the state of Louisiana," and for the "legal representation of governmental officers, agencies, boards, or commissions." La. R.S. § 36:704(E). The AG bears "the responsibility for the policies of the department and for the administration, control, and operation of the functions, programs, and affairs of the department," La. R.S. § 36:701(B), and "shall give his opinion in writing upon all questions of law when required by the governor . . . [or] requested by any state board, agency, or commission or by any political subdivision," save for a few noted exceptions. La. R.S. § 49:251. "Notwithstanding any other law to the contrary," he also "shall represent the state and all departments and agencies of state government in all

---

[3] *See also* Dkt. No. 18-16 ((Fabre Decl.) ("Envoc mobile developers worked closely with the Louisiana OMV, general counsel, the state's Office of Information Technology, and state officials to understand identification credential laws and security components.").

litigation arising out of or involving tort or contract" and, "at his discretion, shall represent or supervise the representation of the interests of the state in any action or proceeding in which the constitutionality of a state statute or of a resolution of the legislature is challenged or assailed." La. Stat. Ann. § 49:257.

## ARGUMENT

Defendants challenge the Court's jurisdiction, "raising both sovereign immunity and standing" in their motion. Def. Br. at 5. The Fifth Circuit has acknowledged that these inquiries "significantly overlap."[4] *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) (quoting *Air Evac EMS, Inc. v. Tex. Dep't of Ins*., 851 F.3d 507, 520 (5th Cir. 2017). Despite the overlap, Defendants' bases for dismissal are taken in turn.

## I.    DEFENDANTS ARE AMENABLE TO SUIT UNDER *EX PARTE YOUNG.*

The Eleventh Amendment constitutionalizes the doctrine of state sovereign immunity, and case law has extended it to include "suit[s] against a state official in his or her official capacity" because such suits are "no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). But the immunity is not absolute, and under the exception carved out in *Ex Parte Young*, a plaintiff may sue individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks only prospective relief. *See Ex Parte Young*, 209 U.S. at 159-60; *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). To satisfy this exception, the named

---

[4] "It may be the case that an official's 'connection to enforcement'"—relevant for determining whether to apply the *Ex Parte Young* exception to sovereign immunity—necessarily "is satisfied when standing has been established." *City of Austin*, 943 F.3d at 1002. At a minimum, "a finding of standing tends toward a finding that the *Young* exception applies to the state official(s) in question." *Id.* (citing *K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir. 2010). Undersigned counsel has not found a case in which a plaintiff failed to establish the traceability and redressability prongs of Article III standing after successfully establishing, per *Ex Parte Young*, the required "connection" between the state official and enforcement of the challenged law.

state official "must have some connection with the enforcement" of the challenged statute. *Ex Parte Young*, 209 U.S. at 157.

### A. Legal Background

Although Defendants fit within the *Ex Parte Young* exception under any legal standard, *see infra*, tracking its recent evolution is critical, as the requirement that the sued officials bear "some connection with the enforcement" of the challenged law has taken on a life of its own in the last decade. Yet while certain Fifth Circuit panels have worked to whittle away at *Young*'s protections, those cases form no obstacle here, as the circuit's *stare decisis* rules do not permit later panels to sharpen the edges of earlier precedents:

> In this circuit, one panel may not overrule the decision, right or wrong, of a prior panel in the absence of an intervening contrary or superseding decision by the court en banc or the Supreme Court. Where two previous holdings or lines of precedent conflict, the earlier opinion controls and is the binding precedent in the circuit. Even a decision not necessary to support the ultimate ruling, such as an alternative holding, is binding. Dicta, however, is persuasive authority only, and is not binding.

*Soc'y of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1211 (5th Cir. 1991), *on reh'g*, 959 F.2d 1283 (5th Cir. 1992) (internal quotation marks and footnotes omitted).

Two evolutions in particular are worth tracking: (1) the nature of the "connection" between the sued state official and the challenged law, and (2) the meaning of "enforcement" that is understood to be the basis for that connection.

### 1. "Some connection with the enforcement"

i.    *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (plurality op.)

In *Okpalobi*, an *en banc* court, weighing a Governor's and Attorney General's assertions of sovereign immunity, examined the "connection" element of the "connection [to] the enforcement" language in *Ex Parte Young*. 244 F.3d 405, 410-24 (5th Cir. 2001) (plurality op.). The plurality reasoned that the "connection" under *Young* required the defendant to have "the

particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Id.* at 416. The plurality also characterized the standard as requiring that the state official be "specially charged with the duty to enforce the statute" and "threatening to exercise that duty." *Id.* at 414.

The case produced a slew of passionate concurrences and dissents—generating a majority only as to the holding that plaintiffs lacked standing. Writing for himself, Judge Benavides criticized the plurality for "turn[ing] reality on its head, granting a state broader immunity from suit in federal court when its officers are not directly involved in the enforcement of an unconstitutional act than when the officers are directly involved"—a position he characterized as "simply untenable." *Okpalobi*, 244 F.3d at 439 (Benavides, concurring in part and dissenting in part). But, he noted, because that "Eleventh Amendment conclusion has not received the votes of a majority of the sitting *en banc* court, it is not controlling authority for future Eleventh Amendment questions in this Circuit." *Id.* at 436 n.6 (citing *Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case . . . the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.").

The *en banc* Fifth Circuit never garnered the votes to breathe life into Judge Jolly's plurality position, and subsequent panels have continued to recognize "that this definition of 'connection'—and the entire Eleventh Amendment sovereign immunity analysis in *Okpalobi*— may not be binding precedent." *City of Austin*, 943 F.3d at 999. Instead, recent panels sympathetic to Judge Jolly's position have laundered it through the one panel decision that failed to acknowledge its limited precedential worth. *That* case was *Morris v. Livingston.*

ii.    *Morris v. Livingston*, 739 F.3d 740 (5th Cir. 2014)

In *Morris*, a panel of the Fifth Circuit held that the Executive Director of the Texas Department of Criminal Justice (TDCJ) was a proper *Ex Parte Young* defendant in an inmate's constitutional challenge to a Texas law administered and enforced by the TDCJ. 739 F.3d at 745-46. Because the Governor had no connection to the challenged law (other than a general duty to see the law enforced), he was properly dismissed from the litigation. *Id.*

The limited holding of *Morris* is unremarkable; what elevates its significance is its reference to the *Okpalobi* "special connection" standard without added qualification placing that plurality opinion in proper precedential context. *See id.* at 746 ("The required 'connection' is not 'merely the general duty to see that the laws of the state are implemented,' but 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'") (quoting *Okpalobi*, 244 F.3d at 416). Since that case, clever courts (or careless ones) have begun citing *Morris* as the "authoritative" source for the requirement that *Young* defendants have the "particular duty" to enforce the statute and the "demonstrated willingness to exercise" it.

 iii.  <u>*Tex. Democratic Party v. Abbott*, 978 F.3d 168 (5th Cir. 2019) (TDP)</u>[5]

In *TDP*, plaintiffs challenged a provision of the Texas Election Code that extended vote-by-mail privileges only to voters over the age of sixty-five. 978 F.3d at 174. They sued the Secretary of State, alleging that the 26th Amendment extended the right to younger voters, too. The court reasoned that because the Secretary of State had "the specific and relevant duty to design the application form for mail-in ballots," which, outside of emergency situations, "local

---

[5] Defendants cite *TDP* throughout their brief for the proposition that the *Ex Parte Young* exception applies only where a state officer has the "particular duty" to enforce the statute in question—meaning that he is "statutorily tasked with enforcing" it. *See* Def. Br. at 6-7; 17-19.

authorities [we]re required to use," the Secretary had the required enforcement role with respect to local officials "based on actions she takes as to the application form." [6] *Id.* at 180.

The court acknowledged the limited import of *Okpalobi*. *Id.* at 179 ("This circuit has not spoken with conviction about all relevant details of the 'connection' requirement."). But "[a]lthough the precise scope of the requirement for a connection has not been defined," the court noted that "the plaintiff at least must show the defendant has 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty'"—which it interpreted to mean that "the official must be statutorily tasked with enforcing the challenged law." *Id.* at 179 (quoting *Morris v. Livingston*, 739 F.3d at 746). Although the quote was originally attributable to *Okpalobi* plurality, *Morris* was the vessel to ensure safe passage into the jurisprudence.

### 2. "Some connection with the <u>enforcement</u>"

### i. *K.P. v. LeBlanc*, 627 F.3d 115 (5th Cir. 2010)

In *K.P.*, a panel considered whether the Louisiana Patients' Compensation Fund Oversight Board (the "Board") had the requisite connection to the enforcement of a challenged statute that removed the medical malpractice cap for abortion providers. 627 F.3d at 119. The Board was charged with overseeing malpractice claims lodged against physicians enrolled in the Patient Compensation Fund, a program that capped physicians' liability in exchange for certain

---

[6] The court saw no need to consider the "far broader reasons for holding the Secretary to be a proper defendant" that plaintiffs asserted via reference to the Secretary's "general duties under the [Election] Code"—including "issuance of directives and instructions, being willing to 'assist and advise' local officials, and endeavoring to 'obtain and maintain uniformity in the application, operation, and interpretation' of the Election Code." *Id.* Because the Secretary's "specific duties" regarding the application form evidenced the mere "scintilla of enforcement authority" required under *Ex Parte Young*, there was no need to consider whether "other duties of the Secretary might suffice." *Id.*

concessions. *Id.* When the Board relied on the statute to deny coverage for an abortion-related malpractice claim, plaintiffs sued, alleging the abortion statute was unconstitutional, and the Board invoked Eleventh Amendment sovereign immunity. *Id.* at 120. Because "the Board's role starts with deciding whether to have a medical review panel consider abortion claims and ends with deciding whether to pay them," its "active role" in enforcing the statute sufficed to bring it within the *Ex Parte Young* exception. *Id.* at 125.

Although the case was one of several not to apply *Okpalobi*'s gloss on the "connection" required by *Young*, *see id.* at 124, its greater significance is as the original source of the proposition that "enforcement" under *Young* "typically involves compulsion or constraint." *Id.* at 124. Writing for the panel, Judge Southwick cited Webster's Third New International Dictionary for that characterization of the term—skipping past the lead definition in that *same dictionary* that defined "enforce" as "to give effect." *See* Webster's Third New International Dictionary. Concurring in judgment, Judge Dennis wrote separately in *K.P.* to push back the court's "conception of 'enforcement' as involving compulsion or constraint," which he believed to be "unnecessarily restrictive." *See id.* at 125 (Dennis, concurring) (citing Black's Law Dictionary, and noting that, "[i]n a legal sense, to 'enforce' a law or regulation simply means '[t]o give force or effect' to it").

ii.    *Air Evac EMS, Inc. v. Tex. Dep't of Ins.*, 851 F.3d 507 (5th Cir. 2017)

*Air Evac* involved the claim of an air-ambulance company that a state workers' compensation statute setting the maximum allowable reimbursements for medical services was preempted by federal law. 851 F.3d at 510-13. The company sued the Texas Commissioner of Insurance and the Texas Commissioner of Workers' Compensation, both of whom engaged in

"rate-setting" under the workers' compensation statute and oversaw the initial arbitration process for provider-insurer fee disputes. *Id.*

The court acknowledged that "'enforcement' under the maximum-reimbursement scheme is not the same type of direct enforcement found in *Ex Parte Young*, for instance, where the attorney general threatened civil and criminal prosecution." *Id.* Nevertheless, "such enforcement is not required." *Id.* (citing *Verizon*, 535 U.S. at 645–46; *K.P.*, 627 F.3d at 124–25). In the court's view, the commissioners *constrained* the company's "ability to collect more than the maximum-reimbursement rate" under the statute and thus "effectively ensur[ed] the maximum-reimbursement scheme [was] enforced from start to finish." *Id.* at 519 (citing *K.P.*).

In characterizing enforcement as typically involving "compulsion or constraint," *K.P.* and *Air Evac* evidently meant it as a rule of *inclusion* and a *broadening* of the "direct enforcement" that litigants (like the *Air Evac* defendants) suggested was required by *Young*. Yet over the next few years, Judge Dennis's dissent in *K.P.* would prove prescient, and "enforcement" would go from "typically involv[ing] compulsion or constraint" to *requiring* it.

### 3. Putting it all together: "<u>Some connection with the enforcement</u>"

    i.    <u>*Tex. Alliance for Retired Ams. v. Scott*, 28 F.4th 669 (5th Cir. 2022) (TARA) and *Lewis v. Scott*, 28 F.4th 659 (5th Cir. 2022)</u>[7]

The capstone of the project to shrink the application of *Ex Parte Young* might be a set of companion cases decided just last term. *TARA* and *Lewis* were published on the same day by the same panel, each involving a constitutional challenge brought against the Texas Secretary of State contesting changes to Texas election laws: An elimination of straight-ticket voting (in

---

[7] Defendants cite *TARA* and *Lewis* extensively throughout their brief—*TARA,* for the proposition that "enforcement" <u>*requires*</u> "compulsion or constraint," *see* Def. Br. at 7, 9, 10, 11, 13, 20, 22, and *Lewis* for the proposition that "enforcement" must be supplied by an officer's "particular duties" rather than her "general duties." Def. Br. at 7, 8, 9, 10, 11, 19.

*TARA*) and regulation of mail-in balloting (in *Lewis*). The panel offered the familiar lamentation that while *Ex Parte Young* demands "*some* connection" between the official and the enforcement of the challenged statute, just "[h]ow much of a 'connection' has been hard to pin down." *TARA*, 28 F.4th at 672 (discussing *Okpalobi* and subsequent criticisms). The Court suggested, however, that "some guideposts have emerged":

> <u>First</u>, an official must have more than "the general duty to see that the laws of the state are implemented." <u>Second</u>, the official must have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." . . . <u>Third</u>, "enforcement" means "compulsion or constraint." If the official does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation.

*TARA*, 28 F.4th 669, 672 (5th Cir. 2022) (internal citations omitted, underlining added).

There's just one problem with these "guideposts"—they're constructed from rotten wood. The First of them credits *City of Austin*, which quotes *Morris*, which quotes … the *Okpalobi* plurality. The second of them credits *TDP*, which (again) quotes *Morris*, which (again) quotes … the *Okpalobi* plurality. The third guidepost credits *City of Austin*, which quotes *K.P.*, which did not "require" compulsion or constraint at all.

Such is the danger with games of judicial telephone. But *this* Court should not follow these guideposts at all, as the cases purporting to establish them either (1) did not turn on those distinctions (making the guideposts mere dicta), or (2) did not displace prior decisions applying more relaxed standards (making the guideposts subordinate to earlier precedents). *See Soc'y of Separationists*, 939 F.2d at 1211).

**B. "Some connection" to statutory enforcement does not demand a "particular duty" or a "demonstrated willingness" to enforce.**

The Commissioner and the Secretary contend that they lack the "particular duty" and the "willingness to enforce" either challenged statute; the Attorney General asserts the same with respect to the Private Enforcement Act only. *See* Def. Br. at 6. For that reason, they allege that

they lack the "connection" required to bring them within the *Young* exception to sovereign immunity.

But "some connection" is not so restrictive under applicable law. Indeed, *Ex Parte Young* itself says that whether that connection "arises out of the general law, or is specially created by the act itself, is not material so long as it exists." 209 U.S. at 157. Later narrowing by a plurality of the *en banc* Fifth Circuit does not suffice to abrogate that precedent.

**C.  "Enforcement" under *Ex Parte Young* does not require "compulsion or constraint."**

Rather than being a mere hallmark of "enforcement," Defendants try to elevate "compulsion or constraint" to the status of *sine qua non* in an *Ex Parte Young* action. *See* Def. Br. at 7. But that is not the law. Indeed, "compulsion or constraint" is not even the primary *definition*. Webster's Third New International Dictionary, the same dictionary that supplied that language in *K.P.*, provides "to give effect" as its first definition of "enforce." *See* Webster's Third New International Dictionary. *See also Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 & n.15 (10th Cir. 2007) (holding that because "the definition of 'enforce'" is "to give effect," state officials bore the required "connection" to the challenged statute where they "assisted or currently assist in giving effect to the law," despite not being "specifically empowered to ensure compliance" with it). Citing Black's Law Dictionary, Judge Dennis noted in his concurrence that "[i]n a legal sense, to 'enforce' a law or regulation simply means '[t]o give force or effect' to it." 627 F.3d at 125 (Dennis, concurring).

This broader definition has been applied by at least one other section of this court. *See Se. Louisiana Bldg. & Const. Trades Council, AFL-CIO v. State of Louisiana ex rel. Jindal Constr. Trades Council ex rel. Jindal*, 2013 WL 6709750, at *10 (E.D. La. Dec. 18, 2013) ("The Court understands 'enforcement' under the *Ex Parte Young* analysis to mean simply '[t]o give force or effect' to the law, as discussed by Judge Dennis in *K.P.*). It is more faithful to the Supreme

Court's conception of the "connection" required by *Ex Parte Young* just a few years after *Young* was decided. *See State of Missouri v. Chicago, B. & Q.R. Co*., 241 U.S. 533, 538 (1916) (explaining that, with respect to *Ex Parte Young* exception, "any officers of the state having any power to directly enforce the law, or, by indirection, to *give effect to* the same in any manner whatever, were qualified as defendants to stand in judgment for the relief asked") (emphasis added). It is more faithful to the Supreme Court's conception of the "connection" required by *Ex Parte Young* some half century later. *See Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979) ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's *operation or enforcement.*") (emphasis added). And it is more faithful to the contemporary definition of "enforce" that the Supreme Court has applied just a few terms ago, albeit in a different context. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 381 (2016) (explaining that "enforce" means to "give force or effect to"). The Fifth Circuit has endorsed the broader definition in other cases and contexts. *See United States v. Hughes*, 914 F.3d 947, 949 (5th Cir. 2019), *as revised* (Feb. 1, 2019 and Feb. 14, 2019) (approving Tenth Circuit's interpretation of "enforce" as including "to give force or effect to") (cleaned up). So have other district courts in Louisiana. *See Terrebonne Par. NAACP v. Jindal*, 2014 WL 3586549, at *6 (M.D. La. July 21, 2014) (defining "enforce" to include "to give force or effect to"); *Louisiana State Conf. of NAACP v. Louisiana*, 490 F. Supp. 3d 982, 1029 (M.D. La. 2020) (same), *aff'd sub nom. Allen v. Louisiana*, 14 F.4th 366 (5th Cir. 2021).

**D. Each Defendant bears "some connection to the enforcement" of the two Acts under *any* definitions or standards.**

If the *Okpalobi* "special connection" standard were indeed the law in the Fifth Circuit (it isn't), a "particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty" *only* "means the official must be 'statutorily tasked with enforcing the

challenged law.'" *TDP*, 978 F.3d at 179 (quoting *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020), *judgment vacated sub nom. Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261 (2021)). A mere "scintilla of enforcement by the relevant state official with respect to the challenged law will do." *Id.* (cleaned up) (citing *City of Austin*, 943 F.3d at 1002). And even if that enforcement "required" some demonstration of "compulsion or constraint" (it doesn't), Defendants are indeed exercising it.

      i.    <u>Commissioner Dardenne</u>

The Commissioner is "statutorily tasked with enforcing the challenged law." As part of the Division of Administration's management of the State's digitized credentialing program, he is required to "promulgate rules and regulations to implement the program and to develop the accessibility of any digitized credential available for use in an electronic wallet." La. R.S. § 39:17.2. But those "rules and regulations"—to the extent they exist at all—fail to implement the program in a constitutionally-compliant manner. Covered websites must employ "reasonable age verification methods" when individuals attempt to access their expression, but "nothing requires that any such methods be made available to all website operators, operate reliably with common computer software, or even exist in the first place." Compl. ¶ 53. "Nothing constrains how quickly such systems must operate or what fees they may charge for their services." Compl. ¶ 53. And as for verification via the State's "digitized identification card" (*i.e.,* LA Wallet), the Commissioner "does not provide it directly but only through a commercial entity that may or may not continue to exist, may or may not choose to do business with covered websites, and may or may not charge constitutionally permissible fees for use of its product." Compl. ¶ 54. Thus, "nothing in the Act requires the State or its contractors to operate a properly constrained prior

restraint on speech, and nothing prevents content-based discrimination that would leave covered websites without any 'reasonable age verification methods' at all." Compl. ¶ 55.

The Commissioner's duties arise not merely from the general law, but from a challenged statutory scheme that contemplates, and indeed *depends on*, the creation of a functional digital credential. And the Commissioner constrains the manner by which online content providers and consumers of that content may reach one another. With a fulsome set of rules and regulations that the Commissioner is duty-bound to create, that communication becomes cheaper, simpler, and safer.

ii.   Secretary LeBlanc

Both Acts require "reasonable age verification methods," which are expressly satisfied where "the person seeking to access the material" is required to provide "a digitized identification card as defined in R.S. § 51:3211." *See* La. R.S. § 9:2800.29(D)(8) and La. R.S. § 51:2121(D)(8). The cross-referenced statute defines "digitized identification card" as "a data file available on any mobile device which has connectivity to the internet through a state-approved application that allows the mobile device to download the data file from the Department of Public Safety and Corrections or an authorized representative of the Department of Public Safety and Corrections that contains all of the data elements visible on the face and back of a license or identification card and displays the current status of the license or identification card." La. R.S. § 51:3211. DPSC is required to provide that privileged access. *See* La. R.S. § 39:15.3(C) (requiring agencies to "cooperate with the office of technology services and provide assistance as required" to "accomplish the work" of that office—including its administration of LA Wallet).

The Secretary's duties arise not just from the general law, but from the statute cross-referenced in the Acts themselves. And as with the Commissioner, the Secretary constrains the

manner by which online content providers and consumers of that content may reach one another by gatekeeping consumer age and identity information from the content providers and their age-verification vendors—thereby privileging *only* the State's preferred vendor with streamlined access while providing no such access to other age verification vendors attempting to compete in that market.

      iii.    <u>Attorney General Landry</u>

The AG, "at his discretion, shall represent or supervise the representation of the interests of the state in any action or proceeding in which the constitutionality of a state statute or of a resolution of the legislature is challenged or assailed." La. Stat. Ann. § 49:257. The State certainly bears an "interest" in seeing its laws survive constitutional challenge, whether raised as claims or as defenses—particularly those laws directed at protecting children. *Cf. Sable Commc'ns of Cal., Inc. v. Fed. Commc'ns Comm'n*, 492 U.S. 115, 126 (1989) ("[T]here is a compelling interest in protecting the physical and psychological well-being of minors[.]"). Whether his duties arise from the challenged statutory scheme or the general law, the AG—tasked with enforcing the nearly identical Public Enforcement Act, and having "protecting innocence" a staple of his tenure—certainly has the duty and the willingness to exercise it.[8]

**II.**    <u>**PLAINTIFFS HAVE STANDING TO PURSUE CLAIMS AGAINST THESE DEFENDANTS.**</u>

To satisfy Article III's standing requirement, plaintiffs must demonstrate (1) an injury that is (2) fairly traceable to the defendant's allegedly unlawful conduct and that is (3) likely to be redressed by the requested relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). These requirements ensure that the parties to any litigation have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the

---

[8] *See* Attorney General, "Protecting Innocence Report," *available at:* https://agjefflandry.com/protectinginnocence

presentation of issues upon which the court so largely depends for illumination." *Massachusetts v. E.P.A.*, 549 U.S. 497, 516 (2007)). "The presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Texas v. United States*, 809 F.3d 134, 151 (5th Cir. 2015), *as revised* (Nov. 25, 2015) (quoting *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n. 2 (2006)).

Defendants contend that Plaintiffs fail to meet the traceability and redressability prongs of the standing analysis. Those requirements are closely related: Where an injury is redressed by a remedy impacting a defendant, that injury usually will be traceable to that defendant, too. *See, e.g., Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997) ("Typically, redressability and traceability overlap as two sides of a causation coin[.]"). *See also* Def. Br. at 13 (acknowledging same). But "[t]racing an injury is not the same as seeking its proximate cause"; the connection may be more attenuated. *See K.P.*, 627 F.3d at 123. Nor must the injury be fully redressable by the relief requested. *See id.* ("[A] plaintiff . . . need not show that a favorable decision will relieve his every injury."); *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) ("[T]he ability to effectuate a partial remedy satisfies the redressability requirement.") (internal quotation marks omitted).[9] Even declaratory (as opposed to injunctive) relief can suffice to establish standing. *See Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 542 (5th Cir. 2008) (recognizing that a plaintiff "can meet the standing requirements when suit is brought under the Declaratory Judgment Act by establishing actual present harm or a significant possibility of future harm").

---

[9] *See, e.g., OCA-Greater Houston v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017) ("The facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the State itself and its Secretary of State, who serves as the 'chief election officer of the state.'").

Here, a judicial decree declaring the Acts unconstitutional, and an injunction precluding Defendants from participating in their enforcement, would spare Plaintiffs from at least some of the harm caused by the Acts. *See TDP*, 978 F.3d at 178 (noting that, because "[t]he Secretary would need to correct the form should the judiciary invalidate the age-based option," he "had a role in causing the claimed injury and is in a position to redress it at least in part," which "is enough to confer standing to the voter plaintiffs"). No more is required.

### A. Enjoining Commissioner Dardenne would redress the harm traceable to that Defendant.

Plaintiffs here have alleged that the Act imposes unconstitutional prior restraints on the communication between covered websites and adults seeking to access them. *See* Compl. ¶¶ 53-55; *supra* at 16-17 (discussing in context of *Ex Parte Young* analysis). Plaintiffs' injuries are, in substantial part, caused by this unconstrained prior restraint on speech that the Commissioner is tasked with constraining. *See* La. R.S. § 39:17.2 ("The commissioner of administration shall promulgate rules and regulations to implement the [digitized credentialing] program and to develop the accessibility of any digitized credential available for use in an electronic wallet."). And they are redressed by an injunction precluding the Commissioner's administration of an unregulated, half-baked program absent substantial improvements that may be negotiated as the case advances.[10]

---

[10] It makes no difference that the Commissioner's role in administering a key component of the scheme is more attenuated from some *other* constitutional infirmities that Plaintiffs have identified and which are unrelated to the availability of a state-provided means of accessing constitutionally-protected material online. *See Uzuegbunam*, 141 S. Ct. at 801 (2021). Yet even those injuries would be redressed by judicial determinations that (1) the prior restraint imposed by the Act demands, at minimum, a properly constrained digitized credentialing program that the Commissioner is statutorily required to provide, and (2) the "reasonable age verification methods" provision of the Act is inseverable from the rest of the Act that, absent such provision, could create a *de facto* ban on the constitutionally protected material at issue.[10] *See generally* Brian Charles Lea, Situational Severability, 103 Va. L. Rev. 735, 758 (2017) (noting that "severability doctrine is most likely to impact the Article III standing analysis" where "(1) a

**Enjoining Secretary LeBlanc would redress the harm traceable to that Defendant.**

As discussed *supra*, "reasonable age verification methods" are met by verifying via a "digitized identification card" that provides for real-time review of a data file pulled from the Department of Public Safety and Corrections database. *See* La. R.S. § 51:3211. This is a privilege enjoyed by Envoc (creator of LA Wallet) and *no one else*, and it's a privilege that DPSC is statutorily required to provide. *See* La. R.S. § 39:15.3(C). Without this assistance, LA Wallet simply wouldn't function.

DSPC is the repository of valuable age and identity information allowing for (relatively) frictionless Act-compliant "reasonable age verification." But by providing a *single* vendor the key to unlock access to all that information, DSPC has endowed Envoc with near monopoly power over qualifying age verification services in Louisiana. No provision of law affords the same right to DSPC's data files to another company attempting to compete in that market. And whereas traditional monopolies are price-regulated, no provision of law constrains Envoc from charging online content providers extortionate prices for use of its services.

An injunction precluding DPSC from providing those data files to Envoc and LA Wallet would, at minimum, place Envoc on similar footing as other vendors in the state—thereby eliminating barriers to market entry for aspiring age verification companies and driving down pricing for consumers of age verification services. This would redress at least some of the harms traceable to the DSPC Secretary and suffered by at least some of the plaintiffs.

**B.     Enjoining the Attorney General would redress the harm traceable to that Defendant.**

---

litigant seeking a benefit necessarily relies on a provision creating the possibility of that benefit; (2) another provision withholds, or authorizes the withholding of, the requested benefit; (3) the benefit-seeking litigant challenges the second provision; and (4) the second provision arguably is inseverable from the first provision").

Standing to sue the AG under the *Private* Enforcement Act is, admittedly, a closer call. The Louisiana Constitution requires a "Department of Justice, headed by the attorney general, who shall be the chief legal officer of the state." La. Const. Art. 4, § 8. That Department (DOJ) includes the Civil Division, which is responsible, *inter alia,* for "providing the full range of civil legal services requested by the officers and agencies of the state," for "the assertion or protection of any right or interest of the state of Louisiana," and for the "legal representation of governmental officers, agencies, boards, or commissions." La. R.S. § 36:704(E). The AG bears "the responsibility for the policies of the department and for the administration, control, and operation of the functions, programs, and affairs of the department," La. R.S. § 36:701(B), and "shall give his opinion in writing upon all questions of law when required by the governor . . . [or] requested by any state board, agency, or commission or by any political subdivision," save for a few noted exceptions. La. R.S. § 49:251. At his discretion, the AG also "shall represent or supervise the representation of the interests of the state in any action or proceeding in which the constitutionality of a state statute or of a resolution of the legislature is challenged or assailed." La. R.S. § 49:257.

Judge Duval found the Louisiana Attorney General's statutory and constitutional duties sufficient for plaintiffs to establish standing in a suit against that officer. *See Bldg. & Const. Trades Council*, 2013 WL 6709750, at *8 (E.D. La. Dec. 18, 2013) ("[T]he Attorney General is constitutionally empowered to intervene in any civil proceeding," and though he "has not enforced the Act in this matter, it does not inhibit the tracing of the injury to [him]."). And the Fifth Circuit has acknowledged similar duties of the Secretary of State to "take action with respect to elections." *Lightbourn v. Cnty. of El Paso*, 118 F.3d 421, 429 (5th Cir. 1997). *Cf. TDP*,

978 F.3d at 174 (declining to consider whether "other duties of the Secretary might suffice" when "specific duties" provided the enforcement authority required under *Ex Parte Young*).

C.      **Declaratory relief would discourage third parties from suing under the Act.**

Declaratory relief from this Court would likewise redress Plaintiffs' injuries by discouraging putative litigants from wasting time suing under a statute promising illusory awards of unrecoverable damages.[11] The Supreme Court has conferred standing based on the anticipated reactions of *nonparties* to a judgment. *See Duke Power Co. v. Carolina Env't Study Grp., Inc*., 438 U.S. 59, 78 (1978) (acknowledging no need for plaintiffs to show "a connection between the injuries they claim and the constitutional rights being asserted" as long as a "causal link" could be found in the prospect of remedial benefit); *Utah v. Evans*, 536 U.S. 452, 463 (2002) (acknowledging Utah's standing so long as "the practical consequence" of the Court's order "would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered"); *Dept. of Commerce v. New York*, 139 S. Ct. 2551 (2019) (concluding that states with a disproportionate share of noncitizens had standing to challenge the inclusion of a citizenship question in the 2020 census where such question would likely result in noncitizen households answering the census at a lower rate than other households, causing those states to lose federal funds).

In the instant case, Plaintiffs' injuries are caused by the Defendants' respective roles in "giving effect to" the Act and are redressed by an appropriate declaration as to the Act's constitutional infirmity. Just as the developers of a nuclear power plant in *Duke Power* would be dissuaded from operating it if the damages cap were invalidated, so too would putative plaintiffs

---

[11] Plaintiffs are *not* arguing that relief in this case would operate as a legal bar against a private litigant suing under the Act in a separate action—a position foreclosed by *Whole Woman's Health*. It *would*, however, provide some strong dissuasion.

be dissuaded from suing under the Act if its unconstitutionality were recognized by a Louisiana federal court such that the prospect of obtaining a judgment in state court diminished.

### III.   *WHOLE WOMAN'S HEALTH* DOES NOT DETERMINE THIS CASE.

Defendants contend that there is no right to seek injunctive relief against Defendants as legal proxies for unnamed private parties who may later sue under the Private Enforcement Act, *see* Def. Br. at 15-16, nor *any* unqualified right to pre-enforcement review of an unconstitutional statute, *see* Def. Br. at 14. Plaintiffs agree on both accounts.

Plaintiffs in *this* case are not asking this Court to enjoin "the world at large," or the "challenged laws themselves," or "all unnamed private persons who might seek to bring their own Private Enforcement Act suits." *See* Def. Br. at 15-16. Rather, they're seeking to enjoin Defendants Dardenne, LeBlanc, and Landry from participating in the Acts' enforcement. As *Whole Woman's Health v. Jackson* makes clear, any such injunction would not preclude future private litigants from suing under the Act. *See* 142 S. Ct. 522, 535 (2021). But insofar as the resulting declaratory and injunctive relief either encourages Louisiana to legislate with a defter hand or discourages private parties from filing suit in the wake of persuasive authority from this Court, Plaintiffs will have accomplished their constitutionally legitimate goal.

The bounds of *Whole Women's Health* will be litigated for some time. But by suggesting that rights-holders have *no right* to pre-enforcement review of an unconstitutional statute, Defendants overread that precedent. The fact that "any individual sued under [the Texas Heartbeat Act] may pursue state and federal constitutional arguments in his or her defense" was important to the Court's holding: Even if Plaintiffs had no right to a federal forum, they could at least vindicate their rights as *defenses* in state court. *See Whole Woman's Health*, 142 S. Ct. at 537. But that is *not* the case for certain Plaintiffs here—like Henson, and perhaps Pfeuffer—who are *not* commercial entities publishing "material harmful to minors" on the internet and therefore

are *not* potential defendants in an action under either of the Acts. In his impassioned dissent in

*TARA* and *Lewis*, Judge Higginbotham asks the reader to "[r]ecall that it was a three-judge

district court, with its injunctive power, that brought *Brown v. Board of Education* to the federal

courts, sustaining the integration of public schools." *TARA*, 28 F.4th at 676 (Higginbotham,

dissenting). Indeed, many laws plainly are *not* amenable to challenge even as a defense:

> For some parties who rely on injunctions to vindicate their substantive rights, []
> defense against an enforcement action is not even a theoretical alternative.
> Consider, for example, someone who is subjected to unconstitutional prayer in a
> public school, or who is denied welfare benefits or fired from a job for
> unconstitutional reasons, or even the plaintiffs in *Brown v. Board of Education*,
> who experienced racial segregation. Does the Constitution guarantee none of
> them rights to sue for injunctions or other remedies adequate to enforce their
> substantive rights?

Fallon, *supra*, at 1306. Reading *Whole Woman's Health* as Defendants suggest would inexorably

shield countless laws from challenge by those affected by the mere *operation* of the laws but not

their *prosecution* by state officials. States—both red and blue—may continue down the path

toward shrouding their unconstitutional laws from judicial review.[12] And constitutional rights

long taken for granted would assume the lesser status of mere ideals—illusory promises subject

to the caprices of a stingy legislature. Neither *Whole Woman's Health* nor any other binding

precedent compels that unfortunate turn.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask this Court to deny Defendants'

motion to dismiss.

---

[12] *See, e.g.,* Cal. Bus. & Prof. Code §§ 22949.60-.71 and Cal. Civ. Proc. Code § 1021.11
(creating a private right of action against any person who manufactures, imports, or sells assault
weapons within the state, with damages of at least $10,000 for each violation).

Respectfully Submitted,

By       */s/ Jeffrey Sandman*

Date: July 26, 2023

_____
Jeffrey Sandman (LA Bar No. 39073)
Webb Daniel Friedlander LLP

D. Gill Sperlein (*pro hac vice* pending)
The Law Office of D. Gill Sperlein

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2023, I electronically filed the foregoing by using the Court's

electronic filing system, which will send a notice of electronic filing to all counsel of record for

Defendants.

By       */s/ Jeffrey Sandman*

_____
Jeffrey Sandman (LA Bar No. 39073)
Webb Daniel Friedlander LLP